373 F.3d 952
 KWAI FUN WONG; Wu-Wei Tien Tao Association, Plaintiffs-Appellees,
v.
UNITED STATES of America, Immigration and Naturalization Service, being sued as David V. Beebe, Jerry F. Garcia, Jack O'Brien, Douglas Glover and John Doe INS Officials; United States of America, Defendants-Appellants.
 No. 02-35727.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 2003.
 Filed June 25, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Anne Murphy, Assistant United States Attorney, Civil Division, Office of the Attorney General, Washington, DC, for the defendants-appellants.
 Zan Tewksbury, Steenson, Schumann, Tewksbury & Rose, P.C., Portland, OR, for the plaintiffs-appellees.
 Steven A. Hirsch, Keker & Van Nest, LLP, San Francisco, CA, for the amicus curiae in support of plaintiffs-appellees.
 Appeal from the United States District Court for the District of Oregon; Robert E. Jones, District Judge, Presiding. D.C. No. CV-01-00718-REJ(JMS).
 Before: GOODWIN, HUG, and BERZON, Circuit Judges.
 BERZON, Circuit Judge:
 
 
 1
 This appeal presents a set of thorny procedural and substantive questions implicating several areas of constitutional and immigration law. These questions include: the scope of some of the jurisdiction-stripping provisions of the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[1]; the boundaries of the constitutional protections afforded certain aliens returning from abroad; and the availability of a qualified immunity defense to federal officials facing Religious Freedom Restoration Act (RFRA)[2] claims. Yet, as this is an appeal from a denial of a motion to dismiss on grounds largely of qualified immunity, we are asked to decide these weighty questions aided only by the skeletal — at best — factual picture sketched out in the complaint.
 
 
 2
 The confluence of two well-intentioned doctrines, notice pleading and qualified immunity, give rise to this exercise in legal decisionmaking based on facts both hypothetical and vague. On one hand, the federal courts may not dismiss a complaint unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation and internal quotation marks omitted). All that is required is a "short and plain statement" of the plaintiff's claims. Fed.R.Civ.P. 8(a)(2); see also Swierkiewicz, 534 U.S. at 512, 122 S.Ct. 992 (citing Fed.R.Civ.P. 8(a)(2)). On the other hand, government officials are entitled to raise the qualified immunity defense immediately, on a motion to dismiss the complaint, to protect against the burdens of discovery and other pre-trial procedures. Behrens v. Pelletier, 516 U.S. 299, 308, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). The qualified immunity issue, in turn, cannot be resolved without first deciding the scope of the constitutional rights at stake. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The unintended consequence of this confluence of procedural doctrines is that the courts may be called upon to decide far-reaching constitutional questions on a nonexistent factual record, even where, as the government defendants contend and as may be the case here, discovery would readily reveal the plaintiff's claims to be factually baseless.
 
 
 3
 We are therefore moved at the outset to suggest that while government officials have the right, for well-developed policy reasons, see Mitchell v. Forsyth, 472 U.S. 511, 525-27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), to raise and immediately appeal the qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case. The ill-considered filing of a qualified immunity appeal on the pleadings alone can lead not only to a waste of scarce public and judicial resources, but to the development of legal doctrine that has lost its moorings in the empirical world, and that might never need to be determined were the case permitted to proceed, at least to the summary judgment stage. Cf. Rescue Army v. Mun. Court of Los Angeles, 331 U.S. 549, 575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) (discussing the difficulties in deciding constitutional questions presented in "highly abstract form").
 
 
 4
 The government officials in this case having appealed despite these considerations, we now turn to the questions they raise, after first recounting the rather sketchy facts we must presume true in this litigation.
 
 I. BACKGROUND
 A. Factual Background
 According to the operative complaint:[3]
 
 5
 Kwai Fun Wong, a citizen of Hong Kong, first lawfully entered the United States in 1985 as a Tao minister. She later became the head of the Wu-Wei Tien Tao Association (hereinafter "Tien Tao") and, according to the belief of her religion, the "heavenly mandated" Matriarch of the Tao Heritage. Tien Tao is a religious organization dedicated to spreading the truth of Tao throughout the world. Followers of Tao believe that "Tao means the Truth, the Path, or the Way and that Tien Tao is the way to return [to] heaven by restoring the original nature."
 
 
 6
 In 1992, Wong's predecessor as leader of Tien Tao, Qian Ren, instructed Wong to apply for permanent residence in the United States so she would be able to pursue Tien Tao's religious mission. Wong filed two petitions with the Immigration and Naturalization Service (INS)[4] for permanent residence, in 1992 and 1994, and resided in the United States while the petitions were pending.[5]
 
 
 7
 When Qian Ren passed away on March 16, 1999, Wong became the head of Tien Tao. To fulfill her religious duties, including arranging the funerary services and meeting with Tao ministers in Hong Kong to plan Tien Tao's future, Wong had to accompany Qian Ren's body back to Hong Kong for burial.
 
 
 8
 Under 8 C.F.R. § 245.2(a)(4)(ii), an alien with a pending application for adjustment of status is considered to have abandoned her application if she leaves the country without first obtaining permission ("advance parole") from the INS.[6] Prior to her departure for Hong Kong, Wong's immigration attorney attempted unsuccessfully to make arrangements with the INS to permit Wong to leave without advance parole.[7] Eleven days after Qian Ren's death, Wong left for Hong Kong without having obtained advance parole or any special dispensation waiving the advance parole requirement.
 
 
 9
 Wong returned to the United States via San Francisco eighteen days later. Upon her arrival, INS officers paroled her into the country pending a deferred inspection in Portland on April 28.[8]
 
 
 10
 Soon thereafter, Wong and Tien Tao filed another adjustment of status application under INA § 245(i) on Wong's behalf. Wong's attorney notified the Portland INS office of Wong's application and asked Defendant-Appellant Jack O'Brien, port director of that office, to contact him if he wished to meet with Wong in person. Wong did not appear for her deferred inspection on April 28, for reasons not explained in the complaint.
 
 
 11
 The next day, April 29, Defendant-Appellant David V. Beebe, district director of the Portland INS office, revoked Wong's parole. Shortly afterward, O'Brien and Defendant-Appellant Douglas Glover, a supervisory inspections officer with the Portland office, issued a "Notice and Order of Expedited Removal" and a determination of inadmissibility. Wong did not receive this Notice until June 22, 1999, the day she was removed from the country.
 
 
 12
 In early June, Wong received a letter from Beebe requesting that Wong appear at the Portland INS office on June 17 to receive her employment authorization card. When Wong presented herself, she was seized by INS officers and handed a letter denying her application for adjustment of status, signed by Defendant-Appellant Jerry F. Garcia on behalf of Beebe. After questioning, Wong was placed in detention, where she remained for five days.
 
 
 13
 At the Multnomah County Detention Center, Wong was subjected to two strip searches, including an orifice search. Wong's requests for vegetarian meals were denied, "interfering with the practice of her faith." During detention Wong was not permitted access to a translator, information about her rights, information about how to contact her attorney, or access to her followers. Despite repeated requests by her attorney, Wong was not accorded a hearing regarding her exclusion from the United States.
 
 
 14
 Wong was removed from the United States on June 22, 1999, and remains outside the country.
 
 B. Claims and Procedural History
 
 15
 Wong and Tien Tao brought this damages action against the INS officials[9] for constitutional violations under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and against the INS officials and the United States for violations of RFRA.[10] Wong and Tien Tao claim that: (1) the INS officials violated their rights under the First and Fifth Amendments to practice their religion and associate with others in the practice of their religion; and (2) the INS officials and the United States substantially burdened their exercise of religion in violation of RFRA. Wong also challenges her treatment while in INS detention, contending that the INS officials violated her right under the Fourth and Fifth Amendments to be free of unreasonable searches and seizures and her rights to liberty, due process, and equal protection of the laws under the Fifth Amendment.
 
 
 16
 Although the factual predicate for some of these claims is unclear, the first amended complaint, construed broadly, challenges on constitutional and RFRA grounds the following alleged actions of the INS officers: refusing to grant Wong permission to depart the United States to fulfill her religious obligations; revoking her parole status without first deciding her new adjustment of status petition; failing during her detention to provide her with a translator, information about her rights, information about how to contact her attorney, and access to her followers; subjecting Wong to strip searches; interfering with Wong's practice of her faith through denial of vegetarian meals while in detention; excluding Wong from the United States and interfering with her duties as a religious leader; discriminating against Wong and Tien Tao on the basis of their religious practices, beliefs, and association; and discriminating against Wong on the basis of her race and/or national origin.
 
 
 17
 The INS officials and the United States filed a motion to dismiss for lack of subject matter jurisdiction, failure to state a claim, and qualified immunity. After a thorough and careful analysis, the magistrate judge recommended the denial of the motion to dismiss in a report of her findings and recommendations, which was adopted in full by the district court.
 
 II. APPELLATE JURISDICTION
 
 18
 The threshold question is whether we have appellate jurisdiction. No doubt we do over the qualified immunity issue. A district court's denial of a motion to grant qualified immunity is an appealable final decision within the meaning of 28 U.S.C. § 1291 to the extent that it turns on a question of law. Behrens, 516 U.S. at 306-07, 116 S.Ct. 834; Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001). Even where controverted issues of material fact remain, an appellate court may review "`abstract issue [s] of law' relating to qualified immunity," taking the facts in the light most favorable to the plaintiff. Behrens, 516 U.S. at 313, 116 S.Ct. 834 (citation omitted).
 
 
 19
 But the government[11] raises several additional issues not ordinarily reviewable on interlocutory appeal. We may exercise "pendent" appellate jurisdiction over an otherwise nonappealable ruling if the ruling is "inextricably intertwined" with a claim properly before us on interlocutory appeal. See Cunningham v. Gates, 229 F.3d 1271, 1284-85 (9th Cir.2000); cf. Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (holding that two district court decisions were not inextricably intertwined because they turned on different issues of law). Two issues are "inextricably intertwined" if they are "(a) [ ] so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." Cunningham, 229 F.3d at 1285 (citations omitted). Applying these standards to consider the reviewability of each of the issues other than qualified immunity raised by one or more defendants, we conclude that some qualify as pendent issues but others do not.
 
 A. Subject Matter Jurisdiction
 
 20
 The government argues that 8 U.S.C. § 1252 bars judicial review of the actions challenged by Wong,[12] and the district court therefore lacks jurisdiction over this case. Ordinarily, though, denial of a motion to dismiss based on lack of jurisdiction is not immediately reviewable. Catlin v. United States, 324 U.S. 229, 236, 65 S.Ct. 631, 89 L.Ed. 911 (1945). Nor is the subject matter jurisdiction question "inextricably intertwined" with the qualified immunity issue. Instead, the court must apply entirely different legal standards to resolve each issue.
 
 
 21
 We have, however, exercised appellate jurisdiction to review issues not "inextricably intertwined" where review of the issue is "necessary to ensure meaningful review of" the issue properly on appeal. Meredith v. Oregon, 321 F.3d 807, 812-13 (9th Cir.2003) (quoting Swint, 514 U.S. at 51, 115 S.Ct. 1203). "Resolution of subject matter jurisdiction... is `necessary to ensure meaningful review of' the district court's interlocutory rulings because if the appellate courts lack jurisdiction, they cannot review the merits of these properly appealed rulings.'" Id. at 816; cf. Spencer Enters., Inc. v. United States, 345 F.3d 683, 687 (9th Cir.2003) ("[E]very federal appellate court has a special obligation to `satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review' ....") (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)) (alteration in original).
 
 
 22
 Accordingly, we have appellate jurisdiction over the subject matter jurisdiction issues.
 
 B. The Bivens Right of Action
 
 23
 The INS officials contend that no right of action exists under Bivens to contest expedited removal under the INA, because the INA is a comprehensive remedial scheme intended to preclude a damages remedy. Cf. Schweiker v. Chilicky, 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); Adams v. Johnson, 355 F.3d 1179, 1183-84 (9th Cir.2004). Interlocutory review of this issue is not available. See Pelletier v. Fed. Home Loan Bank of San Francisco, 968 F.2d 865, 871 (9th Cir.1992) (stating that the consideration of an argument against judicial creation of Bivens remedy was outside the limited scope of a qualified immunity interlocutory appeal), criticized on other grounds in Behrens, 516 U.S. at 308-09, 116 S.Ct. 834. Deciding this question requires the consideration of entirely distinct legal standards from, and its resolution is not a logical predicate to the resolution of, the qualified immunity issue.
 
 
 24
 Nor does the question whether a Bivens remedy may be inferred implicate the very power of the district court to issue the rulings on appeal:
 
 
 25
 [Jurisdiction] is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.... Whether the complaint states a cause of action on which relief could be granted is a question of law and ... must be decided after and not before the court has assumed jurisdiction over the controversy.
 
 
 26
 Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); see also Janicki Logging Co. v. Mateer, 42 F.3d 561, 563 (9th Cir.1994) (determining that the district court had subject matter jurisdiction over a Bivens claim, but that the existence of a comprehensive remedial scheme counseled against permitting a Bivens remedy).
 
 
 27
 We therefore lack jurisdiction in this interlocutory appeal to review the district court's decision to infer a Bivens remedy.
 
 C. Failure to State a Claim[13]
 1. INS officials
 
 28
 The INS officials also seek review of the district court's denial of their motion to dismiss the constitutional and RFRA claims for failure to state a claim, a decision not ordinarily subject to immediate appeal. See Figueroa v. United States, 7 F.3d 1405, 1408 (9th Cir.1993). Whether a complaint fails to allege legally cognizable claims is, however, "inextricably intertwined" with the qualified immunity issue.
 
 
 29
 To determine whether the INS officials are entitled to qualified immunity, we must first consider whether, taken in the light most favorable to the plaintiff, the facts alleged show the violation of a constitutional or statutory right. See Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Similarly, in reviewing a district court's denial of a motion to dismiss for failure to state a claim, we must consider whether, construing the allegations of the complaint in the light most favorable to the plaintiff, it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Zimmerman v. City of Oakland, 255 F.3d 734, 737 (9th Cir.2001) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). So to determine whether the facts as alleged show that the INS officials violated a legal right (the qualified immunity inquiry), we have to determine whether the facts as alleged state a claim for violation of constitutional or statutory rights. See, e.g., Schwenk v. Hartford, 204 F.3d 1187, 1198-99 & n. 8 (9th Cir.2000) (concluding that the review of a denial of a motion to dismiss for failure to state a claim is "part and parcel of the qualified immunity analysis"). We may therefore exercise pendent jurisdiction to review the district court's denial of the substantive motion to dismiss.
 
 2. United States
 
 30
 The United States also moves to dismiss the RFRA claims for failure to state a claim, contending that we may exercise pendent party jurisdiction over its appeal because the issues raised in its appeal are coterminous with those raised by the INS officials' qualified immunity appeal. As will appear, however, our dismissal of the RFRA claim against the INS officials does not dispose of the RFRA claim against the United States. See infra at section V. We therefore lack jurisdiction over the United States' appeal. See Huskey v. City of San Jose, 204 F.3d 893, 905 (9th Cir.2000) ("Th[e] narrow avenue for the continued use of pendent appellate jurisdiction left open by Swint would not apply to the instant case if our ruling on the merits of the collateral qualified immunity appeal did not resolve all of the remaining issues presented by the pendent appeal.").
 
 III. THE INA'S JURISDICTIONAL PROVISIONS
 
 31
 In 1996, as part of IIRIRA, Congress passed several amendments to the INA circumscribing the availability of judicial review. Three of the amendments may affect the district court's jurisdiction over Wong's claims. Keeping in mind the twin background principles that there is a strong presumption favoring judicial review of administrative decisions and that ambiguities in deportation statutes should be construed in favor of the alien, see Montero-Martinez v. Ashcroft, 277 F.3d 1137, 1141 (9th Cir.2002), we consider in turn, de novo, the effect of each relevant provision on subject matter jurisdiction. See United States v. Peninsula Communications, Inc., 287 F.3d 832, 836 (9th Cir.2002).
 
 
 32
 A. 8 U.S.C. § 1252(a)(2)(B) — Review of Discretionary Decisions by the Attorney General[14]
 
 
 33
 Section 1252(a)(2)(B) reads in pertinent part:
 
 
 34
 Denials of Discretionary Relief. — Notwithstanding any other provision of law, no court shall have jurisdiction to review —
 
 
 35
 (i) any judgment regarding the granting of relief under [various provisions of the INA, including that governing adjustment of status, § 245], or
 
 
 36
 (ii) any other decision or action of the Attorney General the authority for which is specified under this title to be in the discretion of the Attorney General....
 
 
 37
 8 U.S.C. § 1252(a)(2)(B). The government maintains that this provision precludes jurisdiction in this Bivens action over Wong's challenges to the decisions regarding adjustment of status, advance parole or permission to depart without advance parole, and revocation of parole.
 
 
 38
 In Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (AADC), the Supreme Court interpreted § 1252(g). In the course of doing so, the Court cautioned that we must be careful not to read broadly language in the INA affecting court jurisdiction that is subject to a "much narrower" interpretation. See id. at 478-82, 119 S.Ct. 936. Consistent with that admonition, we have recognized that the § 1252(a)(2)(B) jurisdictional bar is not to be expanded beyond its precise language.
 
 
 39
 For example, decisions made on a purely legal basis may be reviewed, as they do not turn on discretionary judgment. See Zazueta-Carrillo v. Ashcroft, 322 F.3d 1166, 1169-70 (9th Cir.2003) (decision that alien was statutorily barred from petitioning for adjustment of status was not discretionary and could be reviewed notwithstanding § 1252(a)(2)(B)); Montero-Martinez, 277 F.3d at 1143-44 (§ 1252(a)(2)(B) does not preclude jurisdiction over purely legal, and hence non-discretionary, questions). Moreover, decisions that violate the Constitution cannot be "discretionary," so claims of constitutional violations are not barred by § 1252(a)(2)(B). See Torres-Aguilar v. INS, 246 F.3d 1267, 1270 (9th Cir.2001); see also Sanchez-Cruz v. INS, 255 F.3d 775, 779 (9th Cir.2001). In addition, § 1252(a)(2)(B)(ii) precludes jurisdiction only over decisions as to which discretionary authority is "specified" by statute, not all discretionary decisions. See Spencer Enterprises, Inc., 345 F.3d at 689-90.
 
 
 40
 Under these precedents, the bar on review of discretionary decisions does not apply to Wong's claims. Her claims raise only constitutional or purely legal, nondiscretionary challenges to the decisions in question. Specifically, Wong's complaint alleges that the INS officials' handling of the advance parole, adjustment of status, and revocation of parole decisions was infected by various kinds of discriminatory animus in violation of the Constitution's guarantees against such bias. Her complaint also alleges that the INS officials' handling of these decisions violated RFRA and the due process guarantees of the Fifth Amendment. Section 1252(a)(2)(B) does not preclude the district court from entertaining such claims.
 
 
 41
 B. Section 1252(g) — Review of Decisions or Actions by the Attorney General to Commence Proceedings, Adjudicate Cases, or Execute Removal Orders
 
 
 42
 Section 1252(g) limits judicial review of certain decisions or actions of the Attorney General regarding removal.[15] That provision states:
 
 
 43
 Exclusive Jurisdiction. — Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.
 
 
 44
 8 U.S.C. § 1252(g).
 
 
 45
 AADC held that § 1252(g) "applies only to three discrete actions that the Attorney General may take: her `decision or action' to `commence proceedings, adjudicate cases, or execute removal orders.'" 525 U.S. at 482, 119 S.Ct. 936. Section 1252(g), consequently, does not bar "all claims relating in any way to deportation proceedings." Catholic Soc. Servs., Inc. v. INS, 232 F.3d 1139, 1150 (9th Cir.2000) (en banc). As AADC noted, "[t]here are of course many other decisions or actions that may be part of the deportation process — such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final deportation order ..., and to refuse reconsideration of that order." AADC, 525 U.S. at 482, 119 S.Ct. 936.
 
 
 46
 Following AADC, we have narrowly construed § 1252(g). For example, we have held that "the reference to `executing removal orders' appearing in [§ 1252(g)] should be interpreted narrowly, and not as referring to the underlying merits of the removal decision." Maharaj v. Ashcroft, 295 F.3d 963, 965 (9th Cir.2002) (citations omitted). Similarly, in Barahona-Gomez v. Reno, 236 F.3d 1115, 1120-21 (9th Cir.2001), we held that § 1252(g) does not bar judicial review of decisions or actions that occur during the formal adjudicatory process, because they are separate from the "decision to adjudicate." Sulit v. Schiltgen, 213 F.3d 449 (9th Cir.2000), determined that § 1252(g) does not bar the due process claims of aliens alleging that their green cards were improperly seized without a hearing, that the INS failed to provide them with notice requiring them to surrender for deportation, and that their counsel failed to notify them of the issuance of the court's decision. See id. at 452-53 & n. 1; see also Catholic Soc. Servs., 232 F.3d at 1150 (concluding that § 1252(g) does not limit jurisdiction to grant injunctive relief in a class action challenging the INS's advance parole policy). But see Jimenez-Angeles v. Ashcroft, 291 F.3d 594, 599 (9th Cir.2002) (holding that § 1252(g)'s bar to judicial review of decision whether to commence proceedings precludes review of the decision when to commence proceedings).
 
 
 47
 Characterizing Wong's claims primarily as removal-based, the government urges that they are for the most part barred by § 1252(g). Although her complaint could be read to challenge the constitutionality of the removal itself, Wong has renounced such a broad reading of her ambiguous allegations, stating in her brief that:
 
 
 48
 Plaintiffs' claims [do] not amount to a challenge of the decision of the INS to `commence proceedings,' `adjudicate cases,' or `execute removal orders.' Rather, ... Plaintiffs' claims arise from the discriminatory animus that motivated and underlay the actions of the individual defendants which resulted in the INS's decision to commence removal proceedings and ultimately to remove Plaintiff Wong from the United States.
 
 
 49
 . . .
 
 
 50
 The instant case ... involves claims arising prior to any INS decision `to commence proceedings against Wong, as well as claims that the Defendants placed Wong in a detention situation where she suffered constitutional injury at the hands of third parties.
 
 
 51
 (emphasis added). Wong thus disclaims any challenge to the execution of the removal itself, but rather asserts that her claims implicate only actions other than that removal, or the commencement of proceedings, if any, leading to that removal.[16]
 
 
 52
 Wong is correct that § 1252(g) does not bar review of the actions that occurred prior to any decision to "commence proceedings," if any, against her or to execute the removal order, such as the INS officials' allegedly discriminatory decisions regarding advance parole, adjustment of status, and revocation of parole. See Humphries v. Various Fed. USINS Employees, 164 F.3d 936, 944 (5th Cir.1999) ("[W]e would defy logic by holding that a claim for relief somehow `aris[es] from' decisions and actions accomplished only after the injury allegedly occurred.") (second alteration in original). None of these decisions involves the discrete actions enumerated in § 1252(g).
 
 
 53
 C. Section 1252(a)(2)(A) — Jurisdiction to Review Any Cause or Claim Arising From or Relating to Implementation or Operation of an Expedited Removal Order
 
 
 54
 Similarly, the government asserts that § 1252(a)(2)(A), which deals directly with the expedited removal procedure under which Wong was removed, may also be implicated by Wong's claims. Section 1252(a)(2)(A) reads in relevant part:
 
 
 55
 Notwithstanding any other provision of law, no court shall have jurisdiction to review —
 
 
 56
 (i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1) [setting forth procedures for expedited removal],
 
 
 57
 (ii) except as provided in subsection (e), a decision by the Attorney `General to invoke the provisions of such section, [or]
 
 
 58
 (iii) the application of such section to individual aliens, including the determination made [as to eligibility for asylum].
 
 
 59
 8 U.S.C. § 1252(a)(2)(A). Subsection (e) provides that no court may "enter declaratory, injunctive, or other equitable relief in any action pertaining to an [expedited removal order]," unless certain exceptions not applicable here apply. 8 U.S.C. § 1252(e)(1)(A).
 
 
 60
 Like § 1252(g), § 1252(a)(2)(A) does not preclude Wong's claims concerning events that occurred prior to the decision to initiate her expedited removal — namely, the claims challenging the adjustment of status, advance parole, and revocation of parole decisions. None of these claims implicates actions covered by § 1252(a)(2)(A). And, as we explained above, Wong has expressly disclaimed interpreting her complaint to include a challenge to her expedited removal, maintaining instead that the complaint challenges only the decisions described above, which preceded her removal.[17]
 
 
 61
 We conclude that the district court properly exercised jurisdiction over Wong's claims regarding advance parole, adjustment of status, and parole revocation, as well as over her detention-related claims.
 
 IV. WONG'S CONSTITUTIONAL CLAIMS
 
 62
 We are now ready to consider the merits of this appeal.
 
 
 63
 The qualified immunity defense "`shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Behrens, 516 U.S. at 305, 116 S.Ct. 834 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)) (alterations in original). In deciding whether the INS officials are entitled to qualified immunity, we must undertake two inquiries, both de novo:[18] (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right"; and, if a violation of a constitutional right is found, (2) "whether the right was clearly established." Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
 
 A. Deprivation of a Constitutional Right
 1. Detention-Related Claims
 
 64
 Wong alleges that by, inter alia, denying her vegetarian meals, subjecting her to strip searches, and denying her access to her followers, the INS officials subjected her to detention conditions that violated her First Amendment right to freely practice her religion and her Fourth Amendment right to be free of unreasonable searches and seizures.
 
 
 65
 Wong correctly argues that direct, personal participation is not necessary to establish liability for a constitutional violation. See Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir.1978). "The requisite causal connection can be established ... also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Id. at 743-44; see also Stevenson v. Koskey, 877 F.2d 1435, 1439 (9th Cir.1989) (causation is established where officer participates in the affirmative acts of another that, acting concurrently, result in deprivation of federal rights). The critical question is whether it was reasonably foreseeable that the actions of the particular INS officials who are named as defendants would lead to the rights violations alleged to have occurred during Wong's detention. See Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1044 (9th Cir.1994) (where official did not directly cause a constitutional violation, plaintiff must show the violation was reasonably foreseeable to him).
 
 
 66
 Wong's first amended complaint, however, fails to identify what role, if any, each individual defendant had in placing her in detention, much less whether any of the named INS officials knew or reasonably should have known of the detention conditions to which Wong would be subjected. Without providing the identity of the official or officials who caused the alleged violations, the complaint merely states that Ms. Wong was arrested, handcuffed and placed in detention. She was then taken to the Multnomah County Detention Center where she was subjected to a strip search, including an orifice search, on two separate occasions. Ms. Wong was imprisoned for a total of five days.
 
 
 67
 First Amended Complaint at ¶ 21. With respect to the individual actions of the named defendants, the complaint makes only the following allegations:
 
 
 68
 "Beebe improperly revoked Ms. Wong's parole status," id. at ¶ 18;
 
 
 69
 "Glover and O'Brien erroneously issued a `Notice and Order of Expedited Removal' and a Determination of Inadmissibility," id. at ¶ 19; and
 
 
 70
 "Ms. Wong was given a letter denying her application for the adjustment of status signed by Garcia for Beebe," id. at ¶ 21.
 
 
 71
 The complaint thus fails to identify how the actions of the individual INS officials could foreseeably have caused the First and Fourth Amendment violations Wong is alleged to have suffered while in detention. It is possible that, upon identifying those officials responsible for placing her in detention and for overseeing detention conditions at the INS contract facility in question, Wong may be able to amend her complaint to properly allege constitutional violations by those officials. Her current complaint, however, is insufficient to allege any detention-related constitutional violations by the named INS officials, none of whom is alleged to have played a role in placing her in detention.[19]
 
 
 72
 We conclude that the allegations of the operative, first amended complaint are insufficient to establish a constitutional violation regarding Wong's detention conditions on the part of the named INS officials. As far as the complaint demonstrates, the actions of the named INS officials were simply too far removed from the violations of which Wong complains. Accordingly, Wong's detention-related claims against the named INS officials must be dismissed for failure to state a claim.[20]
 
 2. Due Process
 
 73
 Wong appears to allege that the INS officials violated her procedural due process rights by revoking her temporary parole without first deciding her adjustment of status application. On the bare pleadings, it is difficult to ascertain the contours of this claim, and Wong's briefing before this court has not clarified the legal basis for her allegation that the parole revocation and failure to first decide her adjustment of status application violated the Due Process Clause.
 
 
 74
 "Procedural due process imposes constraints on governmental decisions which deprive individuals of `liberty' or `property' interests within the meaning of the Due Process Clause of the Fifth ... Amendment." Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We can discern no substantive liberty or property interest, however, in temporary parole status, and Wong has alleged none. Section 1182(d)(5)(A) provides that the Attorney General may
 
 
 75
 in his discretion parole into the United States temporarily under such conditions as he may prescribe ... any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.
 
 
 76
 (emphasis added); cf. Sidhu v. Ashcroft, 368 F.3d 1160 (9th Cir.2004) (adopting the BIA's more detailed entry criteria). The INA does not create any liberty interest in temporary parole that is protected by the Fifth Amendment. Rather, the statute makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion of the Attorney General. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (explaining that to possess a property interest in a government benefit, an individual must possess "a legitimate claim of entitlement to it"). Compare Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (holding that a prisoner's interest in not being transferred to another prison facility is "too emphemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all"), with Bd. of Pardons v. Allen, 482 U.S. 369, 377-78, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (holding that a state prisoner has a liberty interest in parole release where the state statute uses mandatory language creating a presumption that parole release will be granted).
 
 
 77
 Wong's due process claim must therefore be dismissed.
 
 3. Discrimination Claims
 
 78
 Wong alleges that the INS officials acted out of discriminatory animus in making their various decisions, including the decisions involving adjustment of status, advance parole, and revocation of temporary parole. Specifically, she alleges that the INS officials discriminated against her on the basis of her race and/or her national origin,[21] and on the basis of her religious practices, beliefs, and association. Taking her allegations in the light most favorable to her, Wong has alleged violations of the equal protection component of the Due Process Clause of the Fifth Amendment, see Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), based on the INS officials' actions. With the exception of the advance parole claim, these allegations could be sufficient to entitle Wong to relief if she is ultimately able to prove that the INS officials' actions were motivated by unlawful discriminatory animus.[22]
 
 
 79
 Wong's advance parole claim must fail because she has not alleged that any of the individual INS defendants were in any way involved with the decision not to grant her a waiver of the advance parole requirement. Her complaint merely states that "Wong attempted to make special arrangements with the INS through her immigration attorney to see if she could leave the United States without the advanced parole, but was unsuccessful." While it is possible that Wong might be able to make out a claim against some INS official based on the allegedly discriminatory advance parole decision, her claim must be dismissed as to the named INS officials, as nothing in the complaint links any of them to unconstitutional behavior with regard to the advance parole issue. See Paine v. City of Lompoc, 265 F.3d 975, 984 (9th Cir.2001) ("[I]n resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant.") (quoting Cunningham, 229 F.3d at 1287). Thus, the facts alleged in the complaint do not establish that any defendant "officer's conduct violated a constitutional right" with regard to the advance parole decision. Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
 
 
 80
 As to Wong's remaining discrimination claims, the INS officials maintain that her "bare allegations" that the INS officials' conduct was due to discriminatory animus are legally insufficient to survive a motion to dismiss for failure to state a claim. This contention is wrong.
 
 
 81
 As Swierkiewicz demonstrates, and as we have had occasion to reiterate recently, the government's contention is belied by federal notice pleading principles. See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061-63 (9th Cir.2004) (holding that the plaintiff's admittedly "opaque[ ]" allegations of discriminatory retaliation were sufficient to withstand a motion to dismiss). "Given the Federal Rules' simplified standard for pleading, `[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992 (alteration in original) (citation omitted). Swierkiewicz specifically disclaimed any requirement that discrimination plaintiffs plead all the elements of a prima facie case. See id. at 510-13, 122 S.Ct. 992; see also Edwards, 356 F.3d at 1061-62. Instead, all that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); Swierkiewicz, 534 U.S. at 512, 122 S.Ct. 992. Such statement must give the defendant fair notice of the basis for the plaintiff's claims. See Swierkiewicz, 534 U.S. at 512, 514, 122 S.Ct. 992; Edwards, 356 F.3d at 1061.
 
 
 82
 Indeed, in Swierkiewicz the Court rejected the very policy argument made by the INS officials in this case:
 
 
 83
 Respondent argues that allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled [plaintiffs] to bring unsubstantiated suits. Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard.... A requirement of greater specificity for particular claims is a result that "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."
 
 
 84
 Id. at 514-15, 122 S.Ct. 992 (citation omitted); see also Galbraith v. County of Santa Clara, 307 F.3d 1119, 1125 (9th Cir.2002) (applying Swierkiewicz to evaluate the complaint in a 42 U.S.C. § 1983 action and concluding that previous cases requiring heightened pleading of improper motive in constitutional tort cases "are no longer good law").
 
 
 85
 The INS officials also contend that Wong alleges claims of selective enforcement which AADC held are not constitutionally cognizable. Citing concerns about judicial interference with the INS's prosecutorial discretion and the need to prevent obstruction and prolongation of the execution of removal orders, AADC indeed announced a "general rule" against selective prosecution claims as a "defense against [ ] deportation." See 525 U.S. at 488-91, 119 S.Ct. 936.
 
 
 86
 Wong, however, does not assert any claims as a defense against exclusion or deportation. Indeed, her claims of discriminatory adjustment of status and parole revocation decisions cannot fairly be characterized as selective prosecution claims at all. The claims do not implicate the Attorney General's prosecutorial discretion — that is, in this context, his discretion to choose to deport one person rather than another among those who are illegally in the country. Rather, Wong alleges that the INS officials denied her various immigration benefits because of her membership in a protected class. As such, the challenged administrative actions, as construed in light of Wong's concessions in the course of this litigation, do not involve the expedited removal itself, and do not pose the threat of obstruction of the institution of removal proceedings or the execution of removal orders about which AADC was concerned. See id. Wong's discrimination claims are not precluded by AADC.
 
 
 87
 4. Applicability of Entry Fiction to Wong's Constitutional Claims
 
 
 88
 The INS officials do not contest that Wong was entitled to constitutional protections on her return despite her brief departure. They argue only that the extent of Wong's constitutional rights was not clearly established, because she was an alien lacking entry papers upon her return. As a result, the INS officials maintain, a reasonable official would not have known that Wong was entitled to the full panoply of protections offered by the Constitution.
 
 
 89
 Despite the limited scope of the officials' argument, we must address to some degree the extent of Wong's entitlement to constitutional rights. Saucier counsels that we must first determine whether a constitutional right has adequately been alleged by the plaintiff before turning to the "clearly established" prong. See 533 U.S. at 200, 121 S.Ct. 2151 ("[T]he requisites of a qualified immunity defense must be considered in proper sequence."); Doe v. Lebbos, 348 F.3d 820, 828 (9th Cir.2003) (noting that although the parties did not brief the issue of whether the plaintiff had adequately alleged the violation of a constitutional right, "[w]e are obligated under Saucier ... to address this issue at the outset of our qualified immunity analysis"). In light of our preceding discussion concluding that only Wong's discrimination claims continue to be viable, see supra at 969, we limit our substantive constitutional analysis to her entitlement to the rights implicated by those claims.[23]
 
 
 90
 The Supreme Court has long recognized a distinction between the constitutional rights afforded those who have effected an entry into the U.S., whether legally or otherwise, and those considered never to have entered. See Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); Xi v. U.S. INS, 298 F.3d 832, 837 (9th Cir.2002). Aliens inside the U.S., regardless of whether their presence here is temporary or unlawful, are entitled to certain constitutional protections unavailable to those outside our borders. See Zadvydas, 533 U.S. at 693-94, 121 S.Ct. 2491; see also Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ("Whatever his status under the immigration laws, an alien is surely a `person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as `persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) ("[The Fourteenth Amendment's] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality.").
 
 
 91
 At the same time, under the "entry fiction" recognized in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), an alien seeking admission has not "entered" the United States, even if the alien is in fact physically present.[24] See id. at 213, 215, 73 S.Ct. 625; see also Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (though present in the United States, excluded alien "was still in theory of law at the boundary line and had gained no foothold in the United States"). Applying this legal fiction, Mezei held that the procedural due process rights of an alien detained on Ellis Island were not violated when he was excluded without a hearing. See Mezei, 345 U.S. at 214, 73 S.Ct. 625. Mezei explained:
 
 
 92
 It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."
 
 
 93
 Id. at 212, 73 S.Ct. 625 (internal citations omitted).
 
 
 94
 The entry fiction thus appears determinative of the procedural rights of aliens with respect to their applications for admission. The entry doctrine has not, however, been applied, by the Supreme Court or by this court, to deny all constitutional rights to non-admitted aliens.[25] As Barrera-Echavarria v. Rison, 44 F.3d 1441 (9th Cir.1995) (en banc),[26] explained, "[w]hile it is ... clear that excludable aliens have no procedural due process rights in the admission process, the law is not settled with regard to nonprocedural rights." Id. at 1449; see also Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491 ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.") (emphasis added); id. at 703-04, 121 S.Ct. 2491 (Scalia, J., dissenting) (noting that the entry fiction only "makes perfect sense ... with regard to the question of what procedures are necessary to prevent entry, as opposed to what procedures are necessary to eject a person already in the United States"). Barrera-Echavarria then went on to consider specifically whether such aliens have a constitutional right to be free from extended detention, concluding that they do not.[27] See 44 F.3d at 1449.
 
 
 95
 Our sister circuits have likewise posited that the entry fiction is pertinent mostly with respect to the narrow question of the scope of procedural rights available in the admissions process, and is not necessarily applicable with regard to other constitutional rights. In Lynch v. Cannatella, 810 F.2d 1363 (5th Cir.1987), for example, the Fifth Circuit held that the entry fiction "determines the aliens' rights with regard to immigration and deportation proceedings[,]" but "does not limit the right of excludable aliens detained within United States territory to humane treatment." Id. at 1373.
 
 
 96
 Similarly, the Third Circuit has recognized that "[e]ven an excludable alien is a `person' for purposes of the Fifth Amendment and is thus entitled to substantive due process." Ngo v. INS, 192 F.3d 390, 396 (3d Cir.1999); see also Rosales-Garcia v. Holland, 322 F.3d 386, 410 (6th Cir.) (en banc) ("The fact that excludable aliens are entitled to less process ... does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments."), cert. denied, 539 U.S. 941, 123 S.Ct. 2607, 156 L.Ed.2d 627 (2003);[28] Sierra v. INS, 258 F.3d 1213, 1218 n. 3 (10th Cir.2001) (noting that the entry fiction "applies to procedural due process challenges such as Sierra's. This case does not involve, and we do not address, a substantive due process challenge").
 
 
 97
 The decisions of courts confronted with the everyday reality of the great number of non-admitted aliens living and working in the American community reflect an understanding that such aliens are undeniably "persons" entitled to constitutional protection, especially with respect to areas not implicating the government's plenary power to regulate immigration. Several courts have held, for example, that non-admitted aliens in the criminal justice system may not be punished prior to an adjudication of guilt in conformance with due process of law, a Fifth and Sixth Amendment safeguard available to citizens and aliens alike. See Alvarez-Mendez v. Stock, 941 F.2d 956, 962 & n. 6 (9th Cir.1991) (considering whether detention of excluded Cuban refugee violated his substantive due process rights, and noting that Fifth and Sixth Amendments apply to aliens as well as citizens); Lynch, 810 F.2d at 1374 ("[W]hatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials."). Courts have held that non-admitted aliens are entitled to Miranda warnings prior to custodial interrogations. See, e.g., United States v. Moya, 74 F.3d 1117, 1119 (11th Cir.1996); United States v. Henry, 604 F.2d 908, 914 (5th Cir.1979).
 
 
 98
 The Supreme Court has also indicated that the equal protection component of the Fifth Amendment's Due Process Clause extends to non-admitted aliens. In Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Court considered whether a statute conditioning eligibility for medicare benefits on five years of continuous residence and admission for permanent residence violated the equal protection rights of Cuban refugees granted temporary parole under 8 U.S.C. § 1182(d)(5). See 426 U.S. at 75 n. 7, 77-83, 96 S.Ct. 1883. Mathews explained that
 
 
 99
 [t]here are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.
 
 
 100
 Id. at 77, 96 S.Ct. 1883 (citations omitted). The Court's sweeping language clearly applied to aliens temporarily paroled into the United States, as two of the plaintiffs were so paroled. See id. at 75 n. 7, 96 S.Ct. 1883. Mathews' significance for present purposes is that the entry fiction does not preclude substantive constitutional protection, including protection under the equal protection component of the Fifth Amendment's Due Process Clause, for aliens paroled into the country after having been stopped at the border.
 
 
 101
 The cases discussed above indicate that the entry doctrine does not categorically exclude non-admitted aliens from all constitutional coverage, including coverage by equal protection guarantees. Recognizing such a logical endpoint to the entry fiction prevents its application from becoming an exercise inconsistent with our basic constitutional values. It also vitiates the perverse incentive that would otherwise exist for aliens to evade immigration checkpoints altogether and thereby acquire constitutional protections. The entry fiction is best seen, instead, as a fairly narrow doctrine that primarily determines the procedures that the executive branch must follow before turning an immigrant away. Otherwise, the doctrine would allow any number of abuses to be deemed constitutionally permissible merely by labelling certain "persons" as non-persons. As Justice Marshall forcefully articulated in his dissenting opinion in Jean v. Nelson, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), addressing a question the majority declined to reach:
 
 
 102
 [T]he principle that unadmitted aliens have no constitutionally protected rights defies rationality. Under this view, the Attorney General, for example, could invoke legitimate immigration goals to justify a decision to stop feeding all detained aliens. He might argue that scarce immigration resources could be better spent by hiring additional agents to patrol our borders than by providing food for detainees. Surely we would not condone mass starvation.
 
 
 103
 Id. at 874, 105 S.Ct. 2992 (Marshall, J., dissenting); see also Zadvydas, 533 U.S. at 704, 121 S.Ct. 2491 (Scalia, J., dissenting) ("I am sure[deportable aliens] cannot be tortured, as well....").
 
 
 104
 In light of these considerations, Justice Marshall concluded in Jean that Mezei's determination with respect to procedural due process rights "is not applicable to the separate constitutional question whether the Government may establish a policy of making parole decisions on the basis of race or national origin without articulating any justification for its discriminatory conduct." Jean, 472 U.S. at 879, 105 S.Ct. 2992 (Marshall, J., dissenting). In his view, "in the absence of any reasons closely related to immigration concerns," the government may not discriminate against unadmitted aliens on the basis of race or national origin. Id. at 881-82, 105 S.Ct. 2992.
 
 
 105
 We are persuaded by the considerations outlined above, and by Justice Marshall's opinion addressing essentially the same question presented here, that the entry fiction does not preclude non-admitted aliens such as Wong from coming within the ambit of the equal protection component of the Due Process Clause. We cannot countenance that the Constitution would permit immigration officials to engage in such behavior as rounding up all immigration parolees of a particular race solely because of a consideration such as skin color.[29] Although "Congress has `plenary power' to create immigration law, and ... the judicial branch must defer to executive and legislative branch decisionmaking in that area, .... that power is subject to important constitutional limitations." Zadvydas, 533 U.S. at 695, 121 S.Ct. 2491; cf. Fiallo v. Bell, 430 U.S. 787, 793 n. 5, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens...."). We can imagine no proper governmental interest furthered by the purely invidious discrimination alleged to have been carried out by individual INS officers in this case.
 
 
 106
 Were there any doubt regarding this general proposition, our decision in this case that the allegations of racial, ethnic, and religious discrimination with regard to decisions concerning temporary parole and adjustment of status are sufficient to state a claim of constitutional violation might still be compelled by both the procedural posture of this case and several considerations particular to Wong. Again, Wong's equal protection claim cannot be dismissed for failure to state a claim unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992 (citation and internal quotation marks omitted); see also Conley, 355 U.S. at 45-46, 78 S.Ct. 99 ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Wong alleges that she resided in the United States continuously for seven years, before her brief departure undertaken under exigent circumstances. She left the country for only eighteen days — a period far briefer than Mezei's "protracted" stay abroad of nineteen months. See Mezei, 345 U.S. at 214, 73 S.Ct. 625; Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491 (discussing Mezei's "extended departure"). More importantly, Wong alleges that her failure to obtain advance parole or a waiver of the requirement was due to invidious discrimination by immigration officials prior to her departure, at which time she undisputedly had a right to be free from such discrimination.[30] See Plyler, 457 U.S. at 215, 102 S.Ct. 2382. Had Wong been granted such a waiver, she would have returned to the United States with the same immigration status she held prior to her departure, and her entitlement to equal protection would have been unquestioned. Under these circumstances, Wong would more properly be viewed as an alien to whom the entry fiction does not apply, as she would have been allowed to enter on her return, and therefore as an alien who is for constitutional purposes "within the United States ... whether [her] presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491. We are for that reason as well unable to conclude that "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992 (citation and internal quotation marks omitted).
 
 
 107
 We therefore conclude that Wong's allegations of invidious discrimination are sufficient at this pleading stage to make out a Fifth Amendment discrimination claim arising out of the INS officials' actions with respect to revocation of Wong's temporary parole status and post-return rejection of her adjustment of status applications.
 
 B. Whether the Law Was Clearly Established
 
 108
 Even where a constitutional violation has occurred, whether an official asserting qualified immunity may be held liable "generally turns on the `objective legal reasonableness' of the action, assessed in light of the legal rules that were `clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citation omitted). Because of the uncertainty surrounding the constitutional status of an alien in Wong's unusual position during the period after her return, we conclude that Wong has not alleged violations of clearly established law.
 
 
 109
 "`[C]learly established' for purposes of qualified immunity means that `[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Wilson v. Layne, 526 U.S. 603, 614-15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034) (alterations in original); see also Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir.2001) (en banc) ("[W]hat is required is that government officials have `fair and clear warning' that their conduct is unlawful.") (citation omitted). In other words, "in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034) (internal quotation marks omitted).
 
 
 110
 A reasonable INS official very well could have been unsure of the level of constitutional protection against discrimination afforded to aliens in Wong's rather unique circumstances.[31] Although we suggested in Barrera-Echavarria that aliens in Wong's position might have some constitutional rights, we have never squarely held that such aliens are entitled to equal protection guarantees, nor has the Supreme Court.
 
 
 111
 Indeed, a dispute over the very issue whether the government can discriminate in granting parole to non-admitted aliens on the basis of race divided the Eleventh Circuit en banc court in Jean, see Jean v. Nelson, 727 F.2d 957 (11th Cir.1984) (en banc), and led to Justice Marshall's dissent on the question when the Supreme Court majority declined to reach the issue. See Jean, 472 U.S. at 868-82, 105 S.Ct. 2992 (Marshall, J., dissenting). Under these circumstances of constitutional uncertainty regarding race discrimination against nonadmitted aliens, the contours of any constitutional doctrine we now recognize were not sufficiently clear that a reasonable INS officer would have realized that Wong after her return was entitled to Fifth Amendment equal protection with regard to immigration-related decisions.[32]
 
 
 112
 Further, while we have concluded that Wong's particular circumstances support the conclusion that it was unconstitutional to discriminate against her on the basis of race, ethnicity, or religion, the complaint does not allege that the present defendants knew that she had been discriminated against with regard to the advance parole or waiver decisions. In the absence of such knowledge, the present defendants were not aware of this reason why Wong could not be discriminated against in violation of the equal protection component of the Due Process Clause.
 
 
 113
 We therefore conclude that the INS officials are entitled to qualified immunity on Wong's remaining discrimination claims.
 
 V. RFRA CLAIMS
 
 114
 The INS officials contend that qualified immunity is available as a defense to Wong's RFRA claims, asserting that they are entitled to prevail on qualified immunity grounds. Neither this court nor any other court of appeals has decided whether qualified immunity is available to a federal government official sued under RFRA.[33] We do not reach that question, however.
 
 
 115
 Wong and Tien Tao assert that by subjecting Wong to strip searches, denying her vegetarian meals, denying her access to her followers, and removing her, the INS officials substantially burdened their religious rights in violation of RFRA. For the reasons discussed above, Wong does not in the presently operative complaint state a claim against the INS officials for violation of her religious rights, because she has failed to allege that any of the individual defendants had anything to do with the detention conditions to which she was subjected. See supra at 967.
 
 
 116
 The question whether the complaint adequately alleges a causal relationship between the actions of the individual INS officials and Wong's detention-based injuries for RFRA purposes is governed by the same legal standard as the question whether the complaint adequately alleges a causal relationship between those actions and Wong's detention-based injuries for constitutional purposes. See, e.g., Stevenson, 877 F.2d at 1439 (explaining that causation can be established by showing that the officer participated in the affirmative acts of another that, acting concurrently, resulted in a deprivation of federal rights). Our resolution of the causation issue with respect to Wong's constitutional claim "necessarily resolves" the causation issue with respect to her RFRA claim. Cunningham, 229 F.3d at 1285 (citations omitted). The two questions are therefore inextricably intertwined. As the RFRA cause of action thus fails without regard to qualified immunity, we do not reach that issue of first impression. We therefore dismiss Wong's RFRA claims as against the individual defendants.
 
 
 117
 Because we do not reach the question whether Wong has otherwise alleged a violation of RFRA, we do not have jurisdiction over the United States' appeal with respect to the RFRA claim.
 
 VI. CONCLUSION
 
 118
 We AFFIRM the district court's denial of the INS officials' motion to dismiss for lack of subject matter jurisdiction. We REVERSE the district court's denial of the INS officials' motion to dismiss, on the respective grounds enumerated in this opinion, on all claims against the individual defendants. We decline to exercise jurisdiction over the appeal of the United States, and REMAND the remainder of the action for proceedings consistent with this opinion.
 
 
 119
 Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Pub.L. No. 104-208, 110 Stat. 3009-546
 
 
 [2]
 42 U.S.C. §§ 2000bb-2000bb-4 (2000). 8464
 
 
 [3]
 All factual allegations are derived from the first amended complaint, the complaint considered by the district court in the decision we review on appeal. After the notice of appeal was filed, appellees filed a second amended complaint, but the government has filed an opposition to the filing of the second amended complaint in the district court. That opposition is still outstanding, as all proceedings in the district court were stayed pending this appeal. We therefore rely exclusively upon the first amended complaint, and do not address whether the allegations Wong seeks to add would support a contrary result. Instead, we leave that question for consideration on remand should the district court permit the filing of the second amended complaint
 
 
 [4]
 Under the Department of Homeland Security Reorganization Plan, the INS was abolished effective March 1, 2003 and its functions transferred to the newly formed Department of Homeland SecuritySee 6 U.S.C. § 542. As the agency was known as the INS at all times pertinent to this appeal, we so refer to it in this opinion.
 
 
 [5]
 Wong's immigration status during the pendency of these petitions is not explained in her complaint. The complaint does allege, however, that Wong's original entry into the United States was lawful, and there is nothing in the complaint to suggest that Wong's presence in the U.S. immediately prior to her departure for Hong Kong was anything but legal
 
 
 [6]
 At the pertinent time, the regulation provided:
 [T]he departure of an applicant [for adjustment of status] who is not under exclusion, deportation, or removal proceedings shall be deemed an abandonment of his or her application constituting grounds for termination, unless the applicant was previously granted advance parole by the Service for such absences, and was inspected upon returning to the United States.
 
 
 [8]
 C.F.R. § 245.2(a)(4)(ii)(A) (1999)
 
 
 [7]
 The complaint does not explain whether Wong sought advance parole before seeking a waiver of the advance parole requirement and if not, why not
 
 
 [8]
 A temporary parolee is considered not to have gained admission to the United StatesSee 8 U.S.C. § 1182(d)(5)(A) ("[P]arole of [any alien applying for admission to the U.S.] alien shall not be regarded as an admission of the alien....").
 
 
 [9]
 We refer to the individual Defendant-Appellants collectively as "INS officials."
 
 
 [10]
 Wong and Tien Tao also assert additional claims not at issue in this appeal
 
 
 [11]
 We refer to the individual INS officials and the United States collectively as "the government," except where necessary to distinguish between the two
 
 
 [12]
 Except when the distinction between the two appellees matters, we refer to both as "Wong."
 
 
 [13]
 We use the phrase "failure to state a claim" to refer to the failure, as a substantive matter, to state a constitutional or statutory claim, not to the existence or nonexistence of aBivens remedy.
 
 
 [14]
 All further references are to 8 U.S.C. unless otherwise noted
 
 
 [15]
 As the government recognizes, nothing in § 1252 bars the claims alleging that Wong's detention conditions violated the Constitution and RFRA
 
 
 [16]
 Of course, Wong will be held in the remainder of this litigation to her representations in this court regarding the intended reach of her complaint. Wong's representations in this court are construed as a waiver of any claims focusing on the execution of the removal or the commencement, if any, of removal proceedingsCf. Janakes v. U.S. Postal Serv., 768 F.2d 1091, 1095-96 (9th Cir.1985) (where Postal Service had abandoned its statutory claims on appeal, court of appeals remanded with instructions to the district court to enter summary judgment against the Service where the Service had no remedies apart from those already abandoned).
 
 
 [17]
 For the same reason, we do not consider whether § 1252(a)(2)(A)'s restrictions on "jurisdiction to review" applies only to petitions for review of decisions of the Bureau of Immigration Appeals, and not toBivens claims such as Wong's. Cf. Avendano-Ramirez v. Ashcroft, 365 F.3d 813, 818 (9th Cir.2004) ("We are ... well aware of the fact that the language `jurisdiction to review' is generally construed to mean review on direct appeal rather than collateral review on habeas corpus.").
 
 
 [18]
 See Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir.2002) (stating that we review qualified immunity decisions de novo). A district court's decision on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is also reviewed de novo. See Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 927 (9th Cir.2002).
 
 
 [19]
 The second amended complaint, unlike the first, alleges that the defendants "caus[ed] Wong to be unlawfully detained and [knew] or ha[d] reason to know she would be subjected to at least two strip searches, including an orifice search ... and [knew] or ha[d] reason to know Wong would be denied vegetarian meals to accommodate her religious tenet." Although these allegations may be sufficient to meet the applicable legal standards, we do not consider them here, as the second amended complaint has been neither accepted nor reviewed by the district court
 
 
 [20]
 We reiterate that we donot decide whether the complaint might be amended to state a claim against the INS official or officials who placed Wong in detention, or the official or officials responsible for monitoring conditions at the detention center, see 8 U.S.C. § 1231(g)(1) (providing that "[t]he Attorney General shall arrange for appropriate places of detention"). Cf. Fed.R.Civ.P. 15(a) ("[L]eave [to amend] shall be freely given when justice so requires."); Fed.R.Civ.P. 15(c)(3) (permitting relation back of amended pleadings).
 
 
 [21]
 We understand Wong's national origin discrimination claim to refer to her ethnicity and not to her country of origin
 
 
 [22]
 We discuss later the question whether Wong is precluded from asserting these otherwise cognizable constitutional rights because of her status as a temporarily paroled alienSee infra, at 973-75.
 
 
 [23]
 We do not consider separately the measure of constitutional rights to which Tien Tao's members might be entitled. The complaint contains no allegation that Tien Tao is suing on behalf of its members, or that its members are U.S. residents, let alone individuals in a different immigration status than Wong
 
 
 [24]
 Aliens granted temporary parole under 8 U.S.C. § 1182(d)(5)(A) fall into this category, as they have not been granted admission to the U.SSee id. ("[P]arole of such alien shall not be regarded as an admission of the alien...."); supra n. 8.
 
 
 [25]
 For the purposes of this opinion, we use the term "non-admitted aliens" to describe those aliens who have presented themselves for immigration inspection and have not been granted an administrative determination of admissibility into the U.S., including those who are paroled in under 8 U.S.C. § 1182(d)(5)(A). We do not use the term to refer to those aliens who were not rejected during immigration inspection and are nonetheless present in this country illegally
 
 
 [26]
 We note thatBarrera-Echavarria's statutory holding — that 8 U.S.C. § 1227(a)(1) authorized the indefinite detention of aliens subject to exclusion proceedings — has since been superseded by statute. See Xi v. INS, 298 F.3d 832, 837 (9th Cir.2002) (explaining that the statute interpreted in Barrera-Echavarria "no longer exists" and that the statute now applicable is 8 U.S.C. § 1231(a)(6)).
 
 
 [27]
 Barrera-Echavarria concluded that Barrera's case was controlled by Mezei, which, the court explained, suggests that "excludable aliens simply enjoy no constitutional right to be paroled into the United States, even if the only alternative is prolonged detention." 44 F.3d at 1450. Barrera-Echavarria went on to explain that its decision was premised on the fact that Barrera's detention was not indefinite, but was instead a series of one-year periods of detention followed by an opportunity for release, and as such, was constitutional. Id. at 1450. Thus, although the court noted that this outcome was "reasonabl[e]" in light of the entry fiction, its decision was based for the most part on considerations particular to the substantive due process right asserted in that case — the right to be free of detention.
 
 
 [28]
 We recognize that the ultimate holding ofRosales-Garcia — that the detention of Cuban nationals under the Cuban Review Plan violates due process, see 322 F.3d at 412-13 — conflicts with Barrera-Echavarria's conclusion that it does not, see 44 F.3d at 1450. Rosales-Garcia characterized the Cuban Review Plan as permitting indefinite detention, see 322 F.3d at 412 n. 30, whereas the Barrera-Echavarria court specifically noted that the Plan's annual review procedures distinguished that case from one involving indefinite detention, see 44 F.3d at 1450. For our analysis, this disagreement on an issue not before us is not pertinent. Rather, what matters for present purposes is that we are in agreement with the Sixth Circuit on the more general principle that the entry fiction is dispositive with respect to procedural rights in the admissions process, but not necessarily with respect to other constitutional protections.
 
 
 [29]
 We do not here address the question whether racial, ethnic, or religious discrimination against immigration parolees is tested by the usual heightened scrutiny applicable to such classificationsSee Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (stating that "all racial classifications imposed by government must be analyzed ... under strict scrutiny") (citation and internal quotation marks omitted); Christian Sci. Reading Room Jointly Maintained v. City and County of San Francisco, 784 F.2d 1010, 1012 (9th Cir.1986) (classifications based on religious sect are suspect), as amended by 792 F.2d 124 (9th Cir.1986). Again, at this juncture we need consider only whether there is any state of facts consistent with the complaint on which Wong could prevail. See Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992. Applying that standard, one set of facts consistent with the complaint is that the defendants refused Wong adjustment of status, or other unidentified INS officials refused her a waiver of advance parole prior to her departure, solely on the basis of her race, ethnicity, or religion, and for no immigration-related reason or other governmental purpose. Were that the case, Wong could prevail even under the "wholly irrational" standard applied in Mathews, where no putatively suspect classification was alleged. In the current posture of this case, that is all we need decide.
 
 
 [30]
 We note that we do not rule out the possibility that Wong's pre-departure discrimination claim with respect to advance parole may still be viable were she to amend her complaint
 
 
 [31]
 We repeat that Wong has only stated a cognizable cause of action against the present defendants with regard to the adjustment of status and revocation of temporary parole decisions made after her return. Were we considering the decisions made before her departure, the entry fiction would not be pertinent, Wong's status as an individual on thePlyler v. Doe/Zadvydas side of the constitutional divide would be plain, and it is quite likely that our conclusion regarding qualified immunity would be otherwise than it is.
 
 
 [32]
 We note that were the race, ethnicity, and religion-based equal protection claims in this case unrelated to Wong's immigration status, we doubt the responsible government officials would be entitled to qualified immunity. As far as we are aware, no court has ever held or indicated that paroled aliens can be subjected torace-based discrimination with regard to issues such as school attendance or police protection while physically within the borders of the country; we suspect no reasonable governmental official could believe such discrimination to be legal.
 
 
 [33]
 Although the INS officials cited toResnick v. Adams, 317 F.3d 1056 (9th Cir.2003), as a case applying qualified immunity to a RFRA claim, that opinion has since been amended to clarify that the RFRA claim was not considered on appeal. See 348 F.3d 763, 766 (9th Cir.2003) (noting that Resnick had amended his complaint to drop his RFRA cause of action). We have, in earlier cases, considered qualified immunity in the context of a cause of action under 42 U.S.C. § 1983 premised on violations of RFRA. See, e.g., May v. Baldwin, 109 F.3d 557, 561-62 (9th Cir.1997) (concluding that prison officials were entitled to qualified immunity in § 1983 suit alleging violations of RFRA); Friedman v. South, 92 F.3d 989, 989 (9th Cir.1996) (holding that RFRA is inapplicable to § 1983 action alleging violations predating RFRA's enactment, because prison officials are entitled to qualified immunity when law is not clearly established). These cases predate City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held RFRA to be unconstitutional as applied to state and local governments. More recently, in Kaahumanu v. County of Maui, 315 F.3d 1215 (9th Cir.2003), we declined to consider whether legislative immunity extends to suits brought under the statute enacted to replace the void provisions of RFRA, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc. See id. at 1219 n. 3.