NIEMEYER, Circuit Judge,
dissenting:
The majority today disregards controlling Supreme Court precedents and belittles the gravity of the issues presented in these cases, purporting to find comfort in its narrow application of the collateral order doctrine. Its effort is regrettably threadbare.
Military contractors performing work in the Iraqi war zone under the command and control of the United States military have invoked our jurisdiction, claiming immunity from tort suits brought by foreign nationals detained as part of the war effort. As a matter of convenience, the majority ducks making a decision on this issue of greatest importance to the public interest because it feels that discovery and further district court proceedings would assist it in making a decision. But in giving that as a reason, the majority fails to follow the Supreme Court’s command in Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), that we hear such claims of immunity now, simply on the basis of the complaint.
It is simply too easy to claim, as does the majority, that unresolved facts bar consideration now of the defendants’ immunity claims. There are always unresolved facts. Without any explanation, the majority fails to recognize that the undisputed facts of the plaintiffs’ claims alone allow a court to rule on the defendants’ immunity claims as a matter of law.
It would appear that only the Supreme Court can now fix our wayward course.
*249 The plaintiffs in these cases are Iraqi citizens, who were seized in Iraq and detained by the U.S. military in Abu Ghraib prison and other military prisons in Iraq. They commenced these actions under state tort law and the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, for alleged injuries sustained from their mistreatment in prison at the hands of the defendants, who were U.S. military contractors, and of the military personnel themselves. As contractors hired by the U.S. military and under its control during the course of the war effort, the defendants in these two cases have asserted various immunities from liability and suit. They claim that the plaintiffs’ claims are barred by (1) derivative sovereign immunity or derivative absolute immunity, as set forth in Mangold v. Analytic Services, Inc., 77 F.3d 1442 (4th Cir.1996); (2) immunity from tort liability in a war zone, as recognized under Saleh v. Titan Corp., 580 F.3d 1 (D.C.Cir.2009), cert. denied, — U.S. —, 131 S.Ct. 3055, 180 L.Ed.2d 886 (2011); and (3) law-of-war immunity, as recognized by the Supreme Court in Dow v. Johnson, 100 U.S. 158, 25 L.Ed. 632 (1880). On the district courts’ rejection of these claims of immunity or their refusal to grant immunity on motions filed under Rules 12(b)(1) and 12(b)(6), the defendants filed these interlocutory appeals.
The majority refuses to address whether the defendants enjoy any of the immunities asserted, holding that the district courts’ decisions made on Rule 12(b)(1) and Rule 12(b)(6) motions are not final appealable orders and that we do not have appellate jurisdiction. With that decision, the majority subjects the defendants to litigation procedures, to discovery, and perhaps even to trial, contrary to the deep-rooted policies inherent in these immunities.
I would reject each of the reasons given by the majority for not deciding the immunity issues at this stage of the case and conclude that we undoubtedly have appellate jurisdiction now to consider them under the well-established principles of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), and their progeny. Cohen authorizes the immediate appeal under 28 U.S.C. § 1291 of important and collateral interlocutory orders that “have a final and irreparable effect on the rights of the parties.” 337 U.S. at 545, 69 S.Ct. 1221. And Behrens and Iqbal clearly establish that these appeals fit comfortably with the Cohen collateral order doctrine because the denial of immunity “at the motion-to-dismiss stage of a proceeding is a ‘final decision’ within the meaning of § 1291.” Iqbal, 556 U.S. at 672, 129 S.Ct. 1937 (citing Behrens, 516 U.S. at 307, 116 S.Ct. 834).
Each of the majority’s reasons for denying review now is demonstrably flawed. In rejecting the right to appeal the district courts’ denials of the derivative absolute immunity described in Mangold, the majority ignores well-established precedent that a district court’s denial of an immunity from suit based on the facts as alleged in the complaint is a final, conclusive order that is immediately appealable as a collateral order. And in rejecting the right to appeal rulings on Saleh and law-of-war immunities, the majority rests heavily on a distinction between an immunity that provides “an insulation from liability” and “an immunity from suit,” concluding that the immunities in this case only protect defendants from civil liability. This analysis misses the point, however. The Supreme Court has found orders denying immunity in its common law sense to be appealable by examining the function performed by parties claiming immunity, the interfer *250 ence with that function a denial of immunity would occasion, and the public interest. In reaching its conclusion, the majority fails to undertake this analysis or recognize the substantial government interest underlying these immunities, an interest with deep roots in the common law.
If there ever were important, collateral decisions that would qualify under Cohen as reviewable final decisions, the district courts’ denials of immunity in these cases are such decisions. The defendants in these cases were engaged by the U.S. military to assist in conducting interrogations under the command and control of U.S. military personnel, and the decisions about the scope and nature of these interrogations were an integral part of the military’s interests. Moreover, the military desperately needed to receive contractor assistance in its interrogations because of a substantial shortage of personnel. Thus, the interrogations were a major component of the war effort, designed to gather military intelligence. These strong public interests merit our consideration of the federal common law immunities claimed by the defendants as protection from any civil suit and from any potential civil liability under state tort law.
Because we have appellate jurisdiction to address one or all of the forms of immunity claimed by the defendants, we would, at the outset, be required to decide our subject matter jurisdiction. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). When considering our jurisdiction, it is apparent that we, as well as the district courts, lack authority under Article III to entertain the actions because they present a nonjusticiable political question.
Accordingly, I would dismiss these appeals and remand them with orders to dismiss the cases as nonjusticiable attempts to engage the judiciary in questions reserved by the Constitution for Congress and the Commander-in-Chief to resolve.
I
In 2003, a multi-national force, led by the United States and Great Britain, invaded Iraq. During the course of the war, the U.S. military seized and detained Iraqi citizens suspected of being enemy combatants or thought to have value in possessing useful intelligence regarding the insurgency or other terrorist activities. These detainees were imprisoned in Abu Ghraib prison and other prisons throughout Iraq. Although these prisons were operated by the U.S. Army in an active war zone, “a severe shortage” of military intelligence personnel “prompt[ed] the U.S. government to contract with private corporations to provide civilian interrogators and interpreters.” J.A. 408. These contractors included CACI Premier Technology, Inc., a subsidiary of CACI International, Inc. (collectively herein, “CACI”) and Titan Corporation, now L-3 Services, Inc. (“L-3”). CACI and L-3 were required to comply with Department of Defense interrogation policies and procedures when conducting “[ijntelligence interrogations, detainee debriefings, and tactical questioning” of persons in the custody of the U.S. military. J.A. 270-71. Secretary of Defense Donald Rumsfeld testified before Congress that the linguists and interrogators provided by contractors at Abu Ghraib were “responsible to [the military intelligence] personnel who hire[d] them and ha[d] responsibility for supervising them.” Hearing of the U.S. Senate Committee on Armed Services 44 (May 7, 2004). Acting Secretary of the Army Les Brownlee also testified that civilian linguists and interrogators “work[ed] under the supervision of officers or non-commissioned officers in charge of whatever team or unit they are on.” Id.
*251 The plaintiffs in these two actions are individuals who were seized and detained by the military at Abu Ghraib prison and other military-controlled prisons “during a period of armed conflict” and “in connection with hostilities.” Second Amended Compl. (“Complaint”) ¶ 497 (Al-Quraishi); Second Amended Compl. (“Complaint”) ¶ 142 (Al Shimari). In their complaints, they allege various acts of assault, sexual assault, humiliation, and inhumane treatment at the hands of the defendants, their employees, and their co-conspirators in the military. They allege that during the course of providing interrogation and translation services for the U.S. military, employees of the defendant corporations conspired with each other and with members of the military to commit torture, assault, battery, and war crimes and that their conduct violated the terms of the contracts that CACI and L-3 had with the U.S. military, the provisions of the U.S. Army field manual, as well as United States law, state law, and the Geneva Convention. Complaint ¶¶ 418, 430, 450, 454, 463, 470 (Al-Quraishi); Complaint ¶¶ 67, 88, 94, 98, 107, 108 (Al Shimari). In addition, they allege that the defendants conspired with each other and with members of the U.S. military to cover-up the misconduct and hide it from the authorities.
The complaints purport to state causes of action under various state-defined torts and under the Alien Tort Statute, naming as defendants CACI, L-3, and Adel Nakhla, an individual employee of L-3, and they demand compensatory damages for physical, economic, and mental injuries; punitive damages to punish defendants for engaging in human rights abuses and to deter similar behavior in the future; and attorney’s fees. Complaint ¶¶ 2, 468-559, 560 (Al-Quraishi)-, Complaint ¶¶2, 113-204, 205; see also Al Shimari v. CACI Premier Tech., Inc., 657 F.Supp.2d 700 (E.D.Ya.2009); Al-Quraishi v. Nakhla, 728 F.Supp.2d 702 (D.Md.2010).
The defendants filed motions to dismiss all of the claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), alleging that the claims were (1) nonjusticiable because they presented a political question, relying on Tiffany v. United States, 931 F.2d 271 (4th Cir.1991); (2) barred by derivative sovereign or absolute official immunity, as set forth in Mangold v. Analytic Services, Inc., 77 F.3d 1442 (4th Cir.1996); (3) preempted and displaced by the federal common law government contractor defense, as set forth in Saleh v. Titan Corp., 580 F.3d 1 (D.C.Cir.2009), cert. denied, — U.S. —, 131 S.Ct. 3055, 180 L.Ed.2d 886 (2011); and (4) barred by the law-of-war immunity recognized by the Supreme Court in Dow v. Johnson, 100 U.S. 158, 25 L.Ed. 632 (1880). With respect to the state law tort claims, both district courts below rejected all of these defenses and denied the motions to dismiss. And with respect to the ATS claims, the Al Shimari court dismissed, concluding that it lacked jurisdiction, 657 F.Supp.2d at 725-728, while the Al-Quraishi court denied the motion to dismiss, 728 F.Supp.2d at 741-60.
A panel of this court reversed the district courts’ orders in two opinions released on the same day, concluding that the district courts should have dismissed the claims on the basis of the government contractor defense recognized in Saleh. Al-Quraishi v. L-3 Servs., Inc., 657 F.3d 201 (4th Cir.2011); Al Shimari v. CACI Int’l, Inc., 658 F.3d 413 (4th Cir.2011). On the plaintiffs’ motions, we granted a rehearing en banc and consolidated the appeals. At our invitation, the United States also participated as an amicus curiae, filing a brief and participating in oral argument on January 27, 2012. The majority now dismisses the appeals for a lack of final *252 appealable orders under 28 U.S.C. § 1291 and thus allows the litigation to proceed in the district courts.
II
Section 1291 of Title 28, authorizing “appeals from all final decisions of the district courts of the United States,” codifies the “final judgment rule,” representing “Congress’ determination since the Judiciary Act of 1789 that as a general rule ‘appellate review should be postponed ... until after final judgment has been rendered by the trial court.’ ” Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal., 426 U.S. 394, 403, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (quoting Will v. United States, 389 U.S. 90, 96, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)). Thus, the Supreme Court has emphasized “the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered.” Mohawk Indus. v. Carpenter, — U.S. —, 130 S.Ct. 599, 605, 175 L.Ed.2d 458 (2009) (quoting Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994)).
Falling within the category of appealable final decisions under § 1291 are certain collateral orders that are “other than final judgments” but “have a final and irreparable effect on the rights of the parties.” Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Under this “practical construction” given to the statutory language “final decisions,” “[t]he authority of the Courts of Appeals to review all final decisions of the district courts” is construed to confer appellate jurisdiction over “ ‘a narrow class of decisions that do not terminate the litigation’ but are sufficiently important and collateral to the merits that they should ‘nonetheless be treated as final.’ ” Will v. Hallock, 546 U.S. 345, 347, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006) (quoting Digital Equip., 511 U.S. at 867, 114 S.Ct. 1992) (internal citation omitted). Thus, to be a final, appealable order, a collateral order must satisfy three requirements: (1) it must “conclusively determine the disputed question”; (2) it must “resolve an important issue completely separate from the merits of the action”; and (3) it must be “effectively unreviewable on appeal from a final judgment.” Johnson v. Jones, 515 U.S. 304, 310, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (internal quotation marks omitted).
The Supreme Court has noted that the “collateral order doctrine” is of “modest scope,” Hallock, 546 U.S. at 350, 126 S.Ct. 952, and should not be applied “to swallow the general rule that a party is entitled to a single appeal,” Mohawk Indus., 130 S.Ct. at 605 (quoting Digital Equip., 511 U.S. at 868, 114 S.Ct. 1992). But, equally important, the Court has noted that the doctrine is necessary and appropriate for cases involving a “particular value of high order” including “honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, [or] respecting a State’s dignitary interests.” Hallock, 546 U.S. at 352-53, 126 S.Ct. 952. In this vein, the Supreme Court and our court have applied the collateral order doctrine to review interlocutory orders denying defendants’ motions to dismiss on the basis of numerous asserted immunities. See, e.g., Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (double jeopardy claim); Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (Speech and Debate Clause immunity); Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (absolute official immunity); Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (qualified immunity); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. *253 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (Eleventh Amendment immunity); Osborn v. Haley, 549 U.S. 225, 127 S.Ct. 881, 166 L.Ed.2d 819 (2007) (Westfall Act immunity certification); Republic of Iraq v. Beaty, 556 U.S. 848, 129 S.Ct. 2183, 173 L.Ed.2d 1193 (2009) (foreign sovereign immunity); Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 127 S.Ct. 2352, 168 L.Ed.2d 85 (2007) (same); Roberson v. Mullins, 29 F.3d 132 (4th Cir.1994) (absolute legislative immunity); Mangold, 77 F.3d 1442 (derivative immunity for a contractor).
Some or all of the defendants’ claims of immunity in these cases are thus entitled to our review under the collateral order doctrine, and I address them seriatim.
A. Derivative Absolute Immunity
Immunity generally protects government officials from liability based on their office, their function, and the public interest. And when litigation is commenced to enforce liability against them, the officials are, if the public interest is sufficiently strong, also protected from defending the suit itself, even when the official is accused of misconduct. See Nixon, 457 U.S. at 752, 102 S.Ct. 2690 (noting that immunity is afforded when it is in the public interest to provide an official “the maximum ability to deal fearlessly and impartially with duties of his office” (internal quotation marks omitted)). Of course, each particular immunity is defined by the official claiming it, by his function, and by the particular public interest sought to be protected.
In this case, the defendants claim, among other immunities, derivative absolute immunity based on their role in carrying out the U.S. military’s mission in the Iraq war zone under the ultimate direction and control of the military. As alleged in the complaints, the defendants were retained by the U.S. military to perform interrogation and translation services in the interrogation of military detainees in military prisons throughout the Iraqi war zone. Complaint ¶¶8, 435, 436, 442 (AlQuraishi); Complaint ¶¶ 1, 10, 64 (Al Shimari ). Indeed, the complaints assert that the defendants were functioning on behalf of the U.S. military and in conspiracy with military personnel “during a period of armed conflict, in connection with hostilities.” Complaint ¶ 497 (AUQuraishi); Complaint ¶ 142 (Al Shimari).
Regardless of whether these facts are ultimately proved, they were alleged by the plaintiffs in their complaints and admitted by the defendants in asserting immunity. And on the basis of these facts, both district courts below conclusively determined that the defendants were not entitled to the derivative immunity recognized in Mangold. In one decision, the district court stated that it “rejected] both arguments” made by the defendant that it was immune under the “doctrine of derivative absolute official immunity” because it could not “determine the scope of Defendants’ government contract, the amount of discretion it afforded Defendants in dealing with detainees, or the costs and benefits of recognizing immunity in this case without examining a complete record after discovery has taken place.” Al Shimari v. CA CI Premier Tech., Inc., 657 F.Supp.2d 700, 714 (E.D.Va.2009) (emphasis added).
In the other decision below, the district court concluded that “relying on the information in the Complaint, it is clearly too early to dismiss Defendants on the basis of derivative sovereign immunity,” explaining that “the contract between [the contractor] and the military is not before the Court at this time,” making it impossible to “determine] both the scope of the contract and whether that scope was exceeded.” Al *254 Quraishi v. Nakhla, 728 F.Supp.2d 702, 735 (D.Md.2010).
Thus, both of these opinions take the facts as alleged by the plaintiffs in their complaints as true and conclude that the defendants were not entitled to derivative immunity.
As both the Supreme Court’s precedents and our precedents clearly establish, when a district court refuses to grant an immunity from suit on the basis of the facts alleged in a complaint, the refusals are immediately appealable. Whether they are rightly or wrongly decided, we have jurisdiction to review such rulings to protect the defendants from the costs and distraction of litigation, which undermine the public interest in protecting the governmental function of war zone interrogations. The district courts’ refusals to recognize this immunity can undoubtedly be immediately appealed under the collateral order doctrine. See Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Behrens v. Pelletier, 516 U.S. 299, 303, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir.1997) (en banc); McVey v. Stacy, 157 F.3d 271, 275 (4th Cir.1998).
The majority does not take issue with the defendants’ claim of immunity under the doctrine of derivative absolute immunity, nor does it take issue with the principle that this immunity protects defendants from suit. Ante, at 223 (“Mangold immunity confers upon those within its aegis the right not to stand trial”). Rather, the majority defers any ruling on the immunity because the “record [was not] sufficiently developed through discovery proceedings to accurately assess any claim, including one of immunity.” As the majority explains:
The Maryland and Virginia district courts each perceived that the validity of such invocations [of immunity] depended in significant part on whether the contractor involved was acting within the scope of its agreement with the United States. One could hardly begin to answer that question without resort to any and all contracts between the appellants and the government pertinent to the claims, defenses, and related matters below.
Ante, at 220. Thus, the majority concludes that because the district courts deferred ruling on derivative immunity until the record was more developed, their decisions lack finality and fail the requirements of Hallock, 546 U.S. at 349-50, 126 S.Ct. 952, that collateral orders be conclusively determined.
The majority fails to recognize, however, that its conclusions are contrary to well-established Supreme Court and Fourth Circuit precedents and that the district courts’ decisions in refusing to grant immunity on motions to dismiss based on Rules 12(b)(1) and 12(b)(6) are appealable final determinations under the collateral order doctrine.
In Behrens, 516 U.S. at 303, 116 S.Ct. 834, the district court had entered an order denying, without prejudice, a motion to dismiss based on a defense of qualified immunity, giving as its reason the fact that it was premature because of the lack of discovery. Both the Ninth Circuit in the first appeal taken and, eventually the Supreme Court, recognized that the district court’s order deferring consideration pending discovery was a final determination of the immunity defense, subject to immediate appeal under the collateral order doctrine. See Pelletier v. Fed. Home Loan Bank of San Francisco, 968 F.2d 865, 871 (9th Cir.1992); Behrens, 516 U.S. at 308, 116 S.Ct. 834 (“Whether or not a later summary judgment motion [on the basis of immunity] is granted, denial of a motion to dismiss is conclusive as to this right ” *255 (emphasis added)). As the Behrens Court noted, at the motion-to-dismiss stage of a proceeding, “it is the defendant’s conduct as alleged in the complaint that is scrutinized.” Behrens, 516 U.S. at 309, 116 S.Ct. 834 (emphasis added); see also Mitchell v. Forsyth, 472 U.S. 511, 529 n. 9, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“[W]e emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged ... support a claim of violation of clearly established law” (emphasis added)).
More recently, in Iqbal, the Supreme Court reaffirmed Behrens and its principle that “a district court’s order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a ‘final decision’ within the meaning of § 1291.” Iqbal, 556 U.S. at 672, 129 S.Ct. 1937 (emphasis added).
Until this decision by the majority, we have applied the reasoning of Mitchell and Behrens faithfully and consistently, holding that the denial of a motion to dismiss based on an immunity that is properly characterized as an immunity from suit, even if on the basis that more discovery is necessary, is a collateral order over which we have jurisdiction under 28 U.S.C. § 1291. In Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir.1997) (en banc), we declared that we had jurisdiction to review a district court’s denial of a motion to dismiss based on qualified immunity even though the district court had refused to rule on immunity at that stage because an answer had not yet been filed. Without qualification, we stated that “[w]hen a district court denies a motion to dismiss that is based on qualified immunity ... the action is a final order renewable by this court.” Id.; see also Winfield v. Bass, 106 F.3d 525, 530 (4th Cir.1997) (en banc) (finding jurisdiction to review an immunity claim “accepting the facts as the district court viewed them,” even though factual issues remained).
Again, in McVey, 157 F.3d at 275, we applied Behrens and concluded that we had jurisdiction over the denial of qualified immunity even though we “recognized that the district court’s order essentially deferring a ruling on qualified immunity would appear, at first blush, to amount to a routine procedural order that is generally not appealable.” As we reasoned:
[I]n rejecting the immunity defense “at this early stage,” the district court necessarily subjected the commissioners to the burden of further trial procedures and discovery, perhaps unnecessarily. [The district court’s] order implicitly ruled against the commissioners on ... legal questions.... These questions do not raise factual questions concerning the defendants’ involvement, which would not be appealable.... On the contrary, they are answered with the facts of the complaint assumed to be true as a matter of law. They are therefore the very questions that Mitchell held were appealable.
Id. at 276 (emphasis added) (internal citations omitted).
Although the majority acknowledges these precedents, it attempts to distinguish them by noting that Behrens “confers jurisdiction of these appeals only if the record at the dismissal stage can be construed to present a pure issue of law.” Ante, at 222. It finds that in these cases “those facts that may have been tentatively designated as outcome-determinative are yet subject to genuine dispute, that is, a reasonable factfinder could conclude in favor of either the plaintiffs or the defendants,” and thus we lack jurisdiction because the “courts’ immunity rulings below turn[ed] on genuineness.” Ante, at 223. The majority’s new “genuineness” addition to the collateral order doctrine, however, finds no *256 support in the Supreme Court’s discussion of collateral order immunity appeals. To the extent the majority is simply stating the well-established rule that a collateral order immunity appeal must present a purely legal question, there can be no debate that the appeals in the cases before us present just such a question. Mitchell, Behrens, and Iqbal establish without question that these appeals present a purely legal question because we are asked to decide whether the defendants are entitled to derivative immunity on the basis of the facts as alleged by the plaintiffs in their complaints. The possibility that a factfinder might construe these facts in favor of the defendants at a later time does not, by some heretofore unknown legal device, create a factual dispute that deprives us of jurisdiction at the motion-to-dismiss stage. As a matter of logical necessity, there can be no genuine issue of material fact when we are reviewing only the facts as alleged by the plaintiff in the complaint. The majority simply ignores Mitchell’s statement that “the appealable issue is a purely legal one: whether the facts alleged ” support a claim of immunity. 472 U.S. at 528 n. 9, 105 S.Ct, 2806.
The majority’s claim that it could only discern a “pure issue of law” if it “were of the opinion, as the dissenters evidently are, that persons similarly situated to the appellants are inevitably and invariably immune from suit,” ante, at 222, demonstrates the fundamental error of its approach. If the majority believes that the defendants cannot establish their claims to immunity from suit, accepting as true the facts in the complaint, then it should deny the derivative immunity defense on the merits and allow the district courts to proceed and develop a fuller factual record. Indeed, Behrens considers this very possibility, allowing the defendants to pursue a second immunity appeal after the denial of summary judgment even if they have already unsuccessfully appealed the district court’s denial of their motion to dismiss. 516 U.S. at 305-08, 116 S.Ct. 834. Surprisingly, the majority admits that we have jurisdiction to review whether “facts that are undisputed or viewed in a particular light are material to the immunity calculus,” ante, at 222, but then mysteriously concludes that we cannot determine whether these same facts establish immunity. Thus, under the majority’s novel approach to the collateral order doctrine, we have jurisdiction to review whether undisputed facts are “material” to a question of immunity, but we have no jurisdiction to review the immunity determination itself. Such a rule finds absolutely no legal support.
Whether it is to avoid the difficulty presented by the political question doctrine or to evade the other difficult questions the merits of these important cases present, the majority chooses to decimate existing collateral order jurisprudence by finding a “genuine” dispute of material fact in a case in which we are asked to review district court decisions denying derivative immunity based only on undisputed facts, those alleged in the complaint. See McVey, 157 F.3d at 276 (“These questions do not raise factual questions concerning the defendants’ involvement.... On the contrary, they are answered with the facts of the complaint assumed to be true as a matter of law. They are therefore the very questions that Mitchell held were appealable”). The majority’s approach is manifestly contrary to the Supreme Court’s collateral order immunity jurisprudence.
Rather than following these binding precedents of the Supreme Court and our court, the majority chooses to rely on a distinguishable Fifth Circuit decision that refused to consider a claim of immunity because it was neither “substantial” nor *257 “colorable.” See Martin v. Halliburton, 618 F.3d 476, 484 (5th Cir.2010). The Martin court, however, did not decide the issue before us today. In that case, regulations governing the contractor explicitly stated that “[ejontractors will not be used to perform inherently governmental functions” and “expressly preclude[d] Defendant [contractors] from engaging in discretionary conduct,” which was a prerequisite for finding derivative immunity. See id. at 484. Thus, the language of the regulations themselves made the defendants’ contentions that they had engaged in the performance of governmental functions frivolous and unsubstantial.
Under our decision in Mangold and its progeny, there can be no serious argument that, based on the complaint, the defendants in these cases failed to present a substantial basis for the immunity. See Mangold, 77 F.3d at 1442 (holding that government junctions performed by private contractors are protected by immunity both for the government and the contractor); see also Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 175 (2d Cir.2006) (government contractor absolutely immune from tort liability for performing eontracted-for governmental function, citing Mangold); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71-73 (2d Cir.1998) (same); Midland Psychiatric Assocs., Inc. v. United States, 145 F.3d 1000, 1005 (8th Cir.1998) (common law official immunity barred tort suit against Medicare insurer). This immunity protects contractors from suit where such an immunity is necessary to protect a discretionary government function and the benefits of immunity outweigh its costs. For example, in Mangold, we held that “the interest in efficient government” justified granting a private contractor immunity for statements made during an official investigation of government procurement practices. 77 F.3d at 1447-48.
And recently, the Supreme Court has reaffirmed the need to protect those who perform government junctions with immunity regardless of whether they are public employees, such as military officers, or private individuals retained to perform the same function. See Filarsky v. Delia, — U.S. —, 132 S.Ct. 1657, 1663, 182 L.Ed.2d 662 (2012) (“[T]he common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities”).
But the majority never disputes this, nor even discusses why the allegations in the complaint present only a frivolous and unsubstantial claim to derivative immunity. Instead, it frames the dispositive question as one of finality. In so doing, the majority ignores the fundamental and well-established principle that a district court’s denial of a motion to dismiss based on an immunity from suit is a final, immediately appealable collateral order. Whether discovery could help make the issue more clear or whether the district courts wanted a fuller record before ruling on the merits of immunity is irrelevant. The defendants claim entitlement to be protected from the litigation process, and the court’s refusal to grant the immunity denied them that protection and was therefore an appealable decision under Mitchell, Behrens, Iqbal, Jenkins, Winfield, and McVey. It is most regrettable that the majority so readily tramples on these precedents, which clearly provide us with appellate jurisdiction at this stage of the proceedings to consider the substantial claims of immunity asserted by the defendants on the basis of the facts alleged in the complaint.[1]
*258 B. Combatant Activities Immunity-under Saleh
The defendants also asserted an immunity from suit based on the combatant activities exception to the Federal Tort Claims Act and the D.C. Circuit’s application of that immunity in Saleh v. Titan Corp., 580 F.3d 1 (D.C.Cir.2009), cert. denied, — U.S. —, 131 S.Ct. 3055, 180 L.Ed.2d 886 (2011). This immunity, applied to military contractors, is based on the United States’ sovereign immunity for claims arising out of combatant activities of the military during time of war. See 28 U.S.C. § 2680(j).
Again, in response to the allegations of the plaintiffs’ complaints, the defendants claimed that their immunity is based on the United States’ interests, as embodied in the combatant activities exception and as applied in Saleh. Under this immunity, when claims arise out of federal combatant activities, the federal interests preempt the application of state tort law to its contractors and then replace state tort law with federal common law, which recognizes an immunity for claims against contractors arising out of combatant activities. The United States’ interest in its contractors’ performance in the course of combatant *259 activities grows out of the uniquely federal interest in the unencumbered operation of military personnel and in the “elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit.” Saleh, 580 F.3d at 7 (emphasis added). “[T]he policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military’s control.” Id. The policy to protect these interests can only be furthered and preserved if the defense protects against potential lawsuits brought under any civilian tort law, not simply against ultimate liability.
The district courts denied the claimed immunities. The court in Al-Quraishi refused to recognize the unique federal interests embodied in the combatant activities exception. Al-Quraishi, 728 F.Supp.2d at 738-39. And the court in Al Shimari simply rejected the defense as to these defendants in a conclusory manner. Al Shimari, 657 F.Supp.2d at 725. Both courts thus held that the defendants were entitled to neither the displacement of state tort law nor the application of federal common law immunizing them from suit.
The majority now refuses also to review these district court orders, thus denying the defendants the combatant activities immunity. It does so mainly by relying on an unexplored labeling problem. It states eonelusorily, “Boyle preemption (and, thus, Saleh preemption) is, ipso facto, not immunity.” Ante, at 217. And again, repeating its labeling reliance, it declares, “Saleh preemption falls squarely on the side of being a defense to liability and not an immunity from suit.” Ante, at 217. The only analysis the majority accords the issue is an observation that immunity “derives from an explicit statutory or constructive guarantee that trial will not occur” (internal quotation marks omitted), and that Boyle, “from which Saleh preemption is derived, [did not rely] on any such explicit guarantee.” Ante, at 217. The majority’s opinion, however, neither considers what Saleh actually held in order to prove its assertion, nor analyzes the text of the combatant activities exception and the unique federal interests it embodies. Moreover, it assumes, without analysis, that Boyle and Saleh are identical for purposes of its collateral order analysis.
Surely our jurisdiction to consider the district courts’ orders cannot depend wholly on labels such as “preemption” and “immunity.” Nonetheless, if a vote on labels were critical, the majority would have little support, as virtually every court that has considered the government contractor defense set forth in Boyle takes it as a two-step defense leading to immunity. Under the first step, the court preempts state tort law, and under the second, it recognizes the federal common law providing immunity to such contractors. See In re Katrina Canal Breaches, 620 F.3d 455, 457 (5th Cir.2010) (characterizing the defense recognized in Boyle as “government contractor immunity”); In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 196 (2d Cir.2008) (“In Boyle, the Court refined the requirements for a type of derivative immunity for government military contractors” (emphasis added)); United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 44 n. 6 (1st Cir.1999) (“[T]he [Boyle] Court used the terminology of ‘displacement of state law’ and ‘preemption’ in determining whether federal law should provide government contractors with immunity from certain state-law product liability actions” (emphasis added)); Winters v. Diamond Shamrock *260 Chem. Co., 149 F.3d 387, 400 (5th Cir.1998) (“The Supreme Court set out the test for immunity under the government contractor defense in Boyle” (emphasis added)); Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 997 (7th Cir.1996) (“The government contractor defense is derived from the government’s immunity from suit when the performance of a discretionary function is at issue” (emphasis added)); Mangold, 77 F.3d at 1448 (“Extending immunity to private contractors to protect an important government interest is not novel. See, e.g., Boyle[ ]” (emphasis added)); Tate v. Boeing Helicopters, 55 F.3d 1150, 1153 (6th Cir.1995) (“The Boyle Court held that, under certain circumstances, government contractors are immune from state tort liability” (emphasis added)); Carley v. Wheeled Coach, 991 F.2d 1117, 1120 (3d Cir.1993) (noting that the rationale that “underlies the modern government contractor defense” is that “[a] private contractor ... should, in some circumstances, share the sovereign immunity of the United States” (emphasis added)); Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1316 (11th Cir.1989) (“In the military context, this [government contractor] immunity serves the further important purpose of shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them” (emphasis added)).
Rather than counting labeling votes, however, we must, in determining our appellate jurisdiction over the defendants’ claim of Saleh immunity, inquire whether the assertion of Saleh immunity falls within the category of collateral orders that the Supreme Court has held appealable under the collateral order doctrine.
We begin by looking to the methodology in Boyle, which was employed by Saleh to identify the unique federal interests in these cases. In Boyle, the Supreme Court referred to the “displacement” of state law with federal common law, 487 U.S. at 505, 507, 512, 108 S.Ct. 2510 (emphasis added), and specifically held that “a few areas, involving ‘uniquely federal interests,’ are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts — so called ‘federal common law.’ ” Id. at 504, 108 S.Ct. 2510 (emphasis added) (internal citation omitted). Thus, it is the content of this federal common law that defines the rights and defenses of the government contractor defendant, not the preemption leading to application of the federal common law.
In Boyle, the father of a deceased helicopter pilot sued the helicopter’s manufacturer, a private government contractor, under Virginia tort law, alleging that the helicopter’s escape hatch had been defectively designed because it opened out rather than in. Id. at 502-03, 108 S.Ct. 2510. While the pilot survived the impact of the helicopter’s crash off the coast of Virginia, he was unable to escape because the water pressure prevented the escape hatch from opening. The Court concluded that “state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a ‘significant conflict’ with federal policy and must be displaced.” Id. at 512, 108 S.Ct. 2510 (emphasis added).
The Boyle Court reached its conclusion through a two-step process. First, it recognized that the subject matter of the suit implicated “uniquely federal interests,” because it involved the “performance of federal procurement contracts,” which “border[ed] upon two areas that [the Court] ha[d] found to involve such ‘uniquely federal interests’ (1) the rights and obli *261 gations of the United States under its contracts, and (2) the “civil liability of federal officials for actions taken in the course of their duty.” Id. at 504-06, 108 S.Ct. 2510. In the second step, after recognizing these interests, the Court asked whether a “significant conflict exist[ed] between an identifiable federal policy or interest and the operation of state law,” and whether “the application of state law would frustrate specific objectives of federal legislation.” Id. at 507, 108 S.Ct. 2510 (internal quotation marks and citation omitted). The Court explained that “[t]he conflict with federal policy need not be as sharp to justify preemption” when a suit involves an area of “unique federal concern,” but nonetheless “conflict there must be.” Id. at 507-08, 108 S.Ct. 2510. The Court then found this conflict in the discretionary function exception to the Federal Tort Claims Act (“FTCA”), noting that it “demonstrates the potential for, and suggests the outlines of, ‘significant conflict’ between federal interests and state law in the context of Government procurement.” Id. at 511, 108 S.Ct. 2510.
The Boyle case thus works the displacement of state law, through preemption, with federal common law and then describes the content of the federal common law government contractor defense, looking for that purpose to the discretionary function exception in the FTCA.
This case, however, does not involve the government contractor defense recognized in Boyle, but rather a defense based on the combatant activities exception, a common law immunity recognized in the FTCA. See 28 U.S.C. § 2680© (retaining sovereign immunity for claims “arising out of the combatant activities of the military or naval forces, or the Coast Guard during time of war”); see also Filarsky, 132 S.Ct. at 1665 (“[W]e ‘proceed[ ] on the assumption that common-law principles of ... immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so’ ” (first alteration in original) (quoting Pulliam v. Allen, 466 U.S. 522, 529, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984))). The defendants in this case asked the district courts to apply the methodology of Boyle, as the court did in Saleh, in order to recognize the federal common law defense based on the combatant activities exception, which is animated by different interests than were at issue in Boyle. See Saleh, 580 F.3d at 6 (“The crucial point is that the [Boyle ] court looked to the FTCA exceptions to the waiver of sovereign immunity in order to determine that the conflict was significant and to measure the boundaries of the conflict” (emphasis added)).[2]
Saleh indeed did apply the Boyle methodology to circumstances identical to those before us. Thus the Saleh court concluded that Congress intended the combatant activities exception to “eliminat[e] ... tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit.” Sa *262 leh, 580 F.3d at 7 (emphasis added). The D.C. Circuit in Saleh explained:
In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the State or foreign sovereign. Rather, it is the imposition per se of the state or foreign tort law that conflicts with the FTCA’s policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, “battle-field preemption”: the federal government occupies the field when it comes to warfare, and its interest in combat is always “precisely contrary” to the imposition of a non-federal tort duty.
Saleh, 580 F.3d at 7. After displacing state tort law in favor of the unique federal interests at stake, the Saleh court dismissed the complaints based on sovereign immunity.
Thus, to reject the defendants’ claim of sovereign immunity under Saleh amounts to subjecting government contractors engaged in the war effort of the military to suits, thereby interfering with the very combatant activities intended to be protected from suit by federal statutory and common law. The government’s unique interest can only be protected and preserved if the Saleh defense to a potential suit is preserved by our review at the outset of litigation. This is because the Saleh immunity serves the interests of freeing officers engaged in combatant activities from “the doubts and uncertainty inherent in potential subjection to civil suit.” Saleh, 580 F.3d at 7 (emphasis added).
Although the legislative history of the combatant activities exception is “singularly barren,” courts have long recognized that the exception serves to exempt activities that “by their very nature should be free from the hindrance of a possible damage suit.” Johnson v. United States, 170 F.2d 767, 769 (9th Cir.1948) (emphasis added). In recognizing the interests that made qualified immunity a protection against standing trial, the Supreme Court has similarly emphasized that “the public interest may be better served by action taken ‘with independence and without fear of consequences.’ ” Mitchell, 472 U.S. at 525, 105 S.Ct. 2806 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). These “consequences” were “not limited to liability for money damages” but also included “ ‘the general costs of subjecting officials to the risks of trial-distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.’ ” Id. at 526, 105 S.Ct. 2806 (quoting Harlow, 457 U.S. at 816, 102 S.Ct. 2727).
Moreover, in Filarsky, the Supreme Court relied on the same public interest in holding that common law immunity protects not only government employees but also private contractors when performing the government’s work:
The public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. Not only will such individuals’ performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation.
Filarsky, 132 S.Ct. at 1666 (citation omitted).
*263 The same concerns recognized in Mitchell and Filarsky animate the combatant activities exception here, ensuring that entities engaged in actions arising out of combatant activities do not suffer “distraction,” are not slowed by “inhibition,” and are willing to serve our country. As Saleh noted, “the federal government occupies the field when it comes to warfare, and its interest in combat is always ‘precisely contrary’ to the imposition of a non-federal tort duty.” 580 F.3d at 7; see also Koohi v. United States, 976 F.2d 1328, 1337 (9th Cir.1992) (“[0]ne purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action”).
In short, the unique federal interest embodied in the combatant activities exception to the FTCA is an interest in freeing military actors from the distraction, inhibition, and fear that the imposition of state tort law by means of a potential civil suit entails. It makes no difference whether the military actors are low-level soldiers, commanders, or military contractors. The Supreme Court has made clear that immunity attaches to the function being performed, and private actors who are hired by the government to perform public functions are entitled to the same immunities to which public officials performing those duties would be entitled. See Filarsky, 132 S.Ct. at 1661-66. The unanimous Supreme Court in Filarsky emphasized that imposing liability on private individuals performing public functions will result in “unwarranted timidity” on the part of “those engaged in the public’s business,” calling this concern “the most important special government immunity-producing concern.” Id. at 1665 (internal quotation marks omitted). It recognized the need to “afford[ ] immunity not only to public employees but also to others acting on behalf of the government” because “often when there is a particular need for specialized knowledge or expertise ... the government must look outside its permanent work force to secure the services of private individuals.” Id. at 1665-66.
This case presents just such an example. The military had a need for specialized language and interrogation skills and hired private individuals to work with the military in performing its public function. Because potential suit and liability would result in “unwarranted timidity” on the part of these government contractors, they must share the common law immunity enjoyed by the military and retained by the FTCA combatant activities exception. These interests underlying this immunity are only protected if the immunity is not only an immunity from liability, but also an immunity from suit.
Thus, the denial of a combatant activities defense will be effectively unreviewable at final judgment because the defendants will no longer be able to vindicate their right to avoid the burdens and distractions of trial. Military contractors will have to undertake future actions “arising out of combatant activities” with the understanding that they are presumptively subject to civil tort law and must abide by state law duties of care in the middle of a foreign war zone. The result will be exactly what the Supreme Court cautioned against in Filarsky: “those working alongside [government employees] could be left holding the bag — facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity.” 132 S.Ct. at 1666. The governmental interests in uninhibited military action and in the attraction of talented candidates, both public and private, animate the combatant activities exception, and these interests are far broader than the limited interests recognized by *264 the majority, which focuses only on “sensitive military issues.” Ante, at 219. Such a narrow mischaracterization of the federal interest ignores the broad language of the exception (protecting actions “arising out of combatant activities”) and finds no support in federal common law.
At bottom, it is readily apparent that the district courts’ orders denying Saleh immunity fall comfortably within the collateral order doctrine. As the Supreme Court has said in summarizing its collateral order precedents:
In each case, some particular value of a high order was marshaled in support of the interest in avoiding trial: honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State’s dignitary interest, and mitigating the government’s advantage over the individual. That is, it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is “effectively” unreviewable if review is to be left until later.
Will v. Hallock, 546 U.S. 345, 352-53, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006) (emphasis added). So it is in these cases.
C. Law-of-War Immunity
Finally, CACI and L-3 claimed protection from suit and from the application of Iraqi law under law-of-war immunity, as recognized in the Supreme Court’s decision in Dow v. Johnson, 100 U.S. 158, 25 L.Ed. 632 (1879), because they were part of the occupying force in the middle of an ongoing war.[3]
The plaintiffs agree that the district courts conclusively decided that defendants were not entitled to law-of-war immunity and that the issue is collateral to the merits. They contend, however, that this immunity is not an immunity from suit but a doctrine of jurisdiction, depriving courts in an occupied territory of jurisdiction over the occupying forces.
In its amicus brief, the United States noted, without explanation, that “Dow and the policies it reflects may well inform the ultimate disposition of these claims,” but the United States was “not prepared ... to conclude that the contractor defendants have demonstrated a right to immediate review of their contentions based on Dow alone.”
The majority again resorts to labels to resolve this immunity issue, noting that Dow does not use the word “immunity.” The fact that Dow does not use the specific term “immunity,” however, has little relevance to the question of whether a ruling denying application of its holding is immediately appealable. Dow characterized the defense at issue as an “exemption from ... civil proceedings,”[4] 100 U.S. at 165 *265 (emphasis added), which, as was customary to find at the time, led to a lack of “jurisdiction” of the court over the defendant, id. at 170. In The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), which was relied on by Dow, the Court similarly used the language of “jurisdiction,” and this phrase was later interpreted by the Supreme Court to stand for what we call, in today’s parlance, foreign sovereign immunity. See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Further, subsequent cases, including Supreme Court decisions, recognize that the Dow protection is a type of immunity. See Underhill v. Hernandez, 168 U.S. 250, 252-53, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Moyer v. Peabody, 212 U.S. 78, 85-86, 29 S.Ct. 235, 53 L.Ed. 410 (1909); “Act of State” Immunity, 57 Yale L.J. 108,112 (1947).
Rather than fuss with a label, however, we must determine the nature of the defense recognized in Doio so as to be able to determine whether its rejection is immediately appealable.
The majority finds it “curious to imagine the nineteenth century [Supreme] Court regarding its decisions in the Civil War cases as having durable precedential effect,” citing no authority to reach that conclusion, and implies they may not “possess continued relevance beyond their immediate context.” Ante, at 217. By contrast, at oral argument, the United States postulated that the “principles of Dow may have further life in other doctrines,” and specifically argued that these principles may be “given effect” by courts in their recognition of the federal common law defense identified in Saleh based on the combatant activities exception. Dow and other cases of its era were decided as a matter of federal and international common law at a time when the Supreme Court recognized the validity of such common law. See Ford v. Surget, 97 U.S. 594, 613, 24 L.Ed. 1018 (1878) (finding a Mississippi civilian immune from civil suit for destroying another citizen’s cotton in support of the occupying Confederate army based on the “common laws of war — those maxims of humanity, moderation, and justice” and the “law of nations”).
Although the invocation of federal common law was restricted severely with the Supreme Court’s decision in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Court’s decision in Boyle nonetheless explicitly instructs courts to displace state tort law with federal common law when the imposition of state tort law would conflict with uniquely federal interests. The immunity recognized in Dow falls within the same body of federal common law that displaces state law under the methodology employed by Boyle. And “common-law principles of ... immunity were incorporated into our judicial system and ... should not be abrogated absent clear legislative intent to do so.” Filarsky, 132 S.Ct. at 1665 (internal quotation marks omitted). For this reason, the immunity claimed by the defendants under Dow and the immunity claimed under the common law defense based on the combatant activities exception are simply two variations of the same principle; they are both a common law immunity from suit. And Boyle provides *266 the methodology for preempting state law and applying the federal common law immunity, as pointed out in Saleh.
The majority relies heavily on the Supreme Court’s statement that an immunity from suit must typically be derived from “an explicit statutory or constitutional guarantee that trial will not occur.” Ante, at 217. Thus, the majority would conclude that Saleh preemption cannot be an immunity from suit, because there is “no contention that the Supreme Court in Boyle [], from which Saleh preemption is derived, relied on any such explicit guarantee embodied in statute or in the Constitution.” Ante, at 217. Retreating almost immediately from this categorical statement, however, the majority then admits in a footnote that the Supreme Court has recognized an implicit immunity from suit when such immunity has a “ ‘good pedigree in public law,’ which more than makes up for its implicitness.” Ante, at 217 n. 9 (quoting Digital Equip., 511 U.S. at 875, 114 S.Ct. 1992). Yet, it continues to overlook the fact that the recognized need in Dow and other cases to free military operations from the duties and standards of state tort law represent the same kind of public law pedigree that led the Supreme Court to recognize qualified immunity, which is a common law defense and is concededly an immediately appeal-able issue. As the Supreme Court recently instructed, “We consult the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed with independence and without fear of consequences.” Rehberg v. Paulk, — U.S. —, 132 S.Ct. 1497, 1503, 182 L.Ed.2d 593 (2012) (internal quotations marks omitted).
Therefore, for the same reasons that the denial of the federal common law defense recognized in Saleh is immediately appeal-able, inasmuch as the exemption from suit will effectively be unreviewable on appeal, the denial of the law-of-war immunity is immediately appealable, either independently or as part and parcel of the Saleh defense. The similarity in language is striking. Dow asks, “[wjhat is the law which governs an army invading an enemy’s country,” and concludes that “[i]t is not the civil law of the invaded country; it is not the civil law of the conquering country: it is military law, — the law of war.” 100 U.S. at 170. Dow continued to reason that “for the protection of the officers and soldiers of the army” the supremacy of the common law of war over the civil law “is as essential to the efficiency of the army as the supremacy of the civil law at home.” Id. (emphasis added). Similarly, Saleh emphasizes the necessary “elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit.” 580 F.3d at 7 (emphasis added). The freedom from “potential subjection” to civil suits and the ability of military personnel and contractors performing military functions to act efficiently, without the distraction and inhibition inherent in the potential imposition of state tort standards of duty onto an active, foreign war zone cannot be vindicated by reviewing the liability of officers or entities after a final judgment.
The denial of any one of the three immunities claimed by CACI and L-3 is undoubtedly immediately appealable under the collateral order doctrine. Not only has the denial of such immunities, even on 12(b)(6) motions, traditionally been found *267 to be immediately appealable, see, e.g., Behrens, 516 U.S. at 305-06, 116 S.Ct. 834, but the substance of each immunity claim is a paradigm example of the type of collateral order that was held immediately appealable in Cohen. The immunities claimed protect the defendants from judicial intervention into battlefield operations, a protection which would necessarily be breached by subjecting battlefield operatives to suit. As noted above, these immunities can only be vindicated and protected by allowing interlocutory appellate review.
Ill
Upon the necessary recognition of our appellate jurisdiction to consider the immunities on an interlocutory basis, we must, at once and as the next immediate step, consider our subject matter jurisdiction, as well as the subject matter jurisdiction of the district courts. “On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself....” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III provides that the judicial power only extends to “Cases” or “Controversies,” U.S. Const. art. Ill, § 2, and the “requirement that jurisdiction be established as a threshold matter ‘spring[s] from the nature and limits of the judicial power of the United States’ and is ‘inflexible and without exception,’ ” id. at 94-95, 118 S.Ct. 1003 (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)).
Even when faced with a collateral order immunity appeal, we are not relieved of the duty to ask first whether the district courts and then whether our court have Article III jurisdiction to hear these eases. See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 488 F.3d 112, 121-22 (2d Cir.2007) (“We conclude that review of [a removal] question is required pursuant to our independent obligation to satisfy ourselves of the jurisdiction of this court and the court below.... This obligation is not extinguished because an appeal [from the denial of sovereign immunity] is taken on an interlocutory basis and not from a final judgment”); Kwai Fun Wong v. United States, 373 F.3d 952, 960-61 (9th Cir.2004) (“Resolution of subject matter jurisdiction is ... necessary to ensure meaningful review of the district court’s interlocutory rulings because if the appellate courts lack jurisdiction, they cannot review the merits of these properly appealed rulings” (internal quotation marks omitted) (alterations in original)); Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 429 (5th Cir.2002) (“[W]here, as in the instant case, we have interlocutory appellate jurisdiction to review a district court’s denial of Eleventh Amendment immunity, we may first determine whether there is federal subject matter jurisdiction over the underlying ease”); Timpanogos Tribe v. Conway, 286 F.3d 1195, 1201 (10th Cir.2002) (“[Jjurisdiction is a threshold question which an appellate court must resolve before addressing the merits of the matter before it.... [B]ecause we have appellate jurisdiction over the interlocutory appeal of defendants’ assertion of Eleventh Amendment immunity, we also have appellate jurisdiction to determine whether the district court had subject matter jurisdiction over the Tribe’s underlying claim against defendants in the first instance”).[5]
*268 In the cases presently before us, the plaintiffs have asked civilian courts to entertain state tort law causes of action based on conduct taken in connection with an active and ongoing war against another sovereign. To entertain the plaintiffs’ claims would impose, for the first time, state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions textually committed by our Constitution to Congress, the President, and the Executive Branch. See U.S. Const art. I, § 8, els. 11-14 (authorizing Congress to declare war, to raise armies and create a navy, and to make rules for the military); id. art. II, § 2 (providing that the President “shall be Commander-in-Chief of the army and navy of the United States, and of the militia of the several states, when called into the actual Service of the United States”). Because these cases implicate several “textually demonstrable constitutional commitment[s]” of authority to the “political department^],” they have no place in federal courts and must be dismissed for lack of jurisdiction. Baker v. Carr, 369 U.S. 186, 216, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
The plaintiffs in these cases were seized in a war zone by the military, having been suspected of hostile activity or of possessing useful intelligence. The function of detaining and interrogating such persons to obtain intelligence was undoubtedly critical to the success of military strategies and campaigns. The judgment of whom to interrogate, what to inquire about, and the techniques to use fell comfortably within the powers of the Commander-in-Chief and his subordinates in the chain of command. And CACI and L-3, as civilian contractors of the military, worked side by side with the military to carry out these military operations under the ultimate supervision and command of the military “during a period of armed conflict and in connection with hostilities.” They were engaged by the military to pursue interrogations under the command and control of military personnel with respect to persons detained by the military. And, consistent with the close connection between the military and the military contractors, the complaints allege that the military and the civilian contractors conspired in their abuse of the military detainees.
For the reasons I gave in my panel concurrence in Al Shimari, 658 F.3d at 420-25 (Niemeyer, J., concurring), and the reasons given by Judge King in his majority opinion in Taylor v. Kellogg Brown & Root Services, 658 F.3d 402, 412 (4th Cir. 2011), I would conclude that the political question doctrine deprives both this court and the district courts of subject matter jurisdiction to hear these cases. See also Massachusetts v. EPA, 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (“It is ... familiar learning that no justiciable ‘controversy’ exists when parties seek adjudication of a political question”); Tiffany v. United States, 931 F.2d 271, 277 (4th Cir.1991) (“Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense.... The strategy and tactics employed on the battlefield are clearly not subject to judicial review”); Carmichael v. Kellogg Brown & Root Servs., Inc., 572 F.3d 1271, 1283 (11th Cir.2009).
Accordingly, while we undoubtedly have appellate jurisdiction under Cohen to con *269 sider these appeals at this stage in the proceedings, we lack subject matter jurisdiction over these cases, as did the district courts. I would therefore dismiss these appeals for lack of subject matter jurisdiction and remand the cases to the district courts with orders that they likewise dismiss the cases for lack of subject matter jurisdiction.
Judge Wilkinson and Judge Shedd have indicated that they join this opinion.

. The majority also inexplicably dismisses L-3's arguments relating to the Alien Tort Stat *258 ute in a footnote, claiming that they deserve no different analysis than do the state law claims. Ante, at 223-24 n. 19. But in so concluding, the majority fails to recognize that plaintiffs' Alien Tort Statute claims, of jurisdictional necessity, include allegations that the defendants' allegedly abusive conduct was the conduct of the United States and therefore any claim of derivative immunity would have to be substantial as a matter of law.
Although the district court in Al Shimari dismissed the plaintiffs’ claims under the ATS, the district court in Al-Quraishi failed to dismiss the ATS claims against L-3 and its employee. L-3 contends on appeal that the denial of its motion to dismiss the ATS claims on account of derivative immunity, among other defenses, was an error. L-3’s claim to derivative absolute immunity in the ATS context is thus undeniably "substantial.” In Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C.Cir.1985), plaintiffs alleged that defendants had violated the law of nations by engaging in "summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities,” as part of a conspiracy arising out of the U.S. government's actions in Nicaragua. Id. at 205. In a unanimous opinion authored by then-Judge Scalia and joined by then-Judge Ginsburg, the D.C. Circuit found that "[i]t would make a mockery of the doctrine of sovereign immunity” to permit the ATS claims to proceed based on "actions that are, concededly and as a jurisdictional necessity, official actions of the United States.” Id. at 207. Like the allegations in Sanchez-Espinoza, plaintiffs must, to maintain their ATS claims, allege that the actions of the defendants were actions of the United States as a jurisdictional necessity. See Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir.1995) ("[T]orture and summary execution ... are proscribed by international law only when committed by state officials or under color of law”). To establish jurisdiction for their ATS claims alleging "war crimes,” the plaintiffs must at the very least allege that the defendants in this case were "parties” to the hostilities in Iraq, id., and may have to demonstrate state action as well if the court considered war crimes to violate international norms only to the extent they were committed by combatants or state actors, see Sosa v. Alvarez-Machain, 542 U.S. 692, 731-38, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791-95 (D.C.Cir.1984) (Edwards, J„ concurring).
Thus, the defendants' claims to derivative immunity as to the ATS claims in Al-Quraishi are obviously substantial because plaintiffs must allege as a jurisdictional necessity either state action or that the defendants were "parties” to the armed conflict in Iraq. Both allegations add further weight to the contention that the defendants were performing a state function and thus entitled to the same immunities afforded public officials performing that function. See Filarsky, 132 S.Ct. at 1663. I therefore fail to understand how these defenses can be dismissed as so insubstantial and frivolous that we lack jurisdiction even to entertain them.

. The majority’s assertion that we are "repackaging for the sake of convenience the preemption defense derived from Boyle as 'combatant activities immunity,’ ” ante, at 218, ignores the fact that Boyle and Saleh, though they both apply preemption, then proceed to apply different principles of federal common law to the issue at hand. Thus, not only are we not applying the common law applied in Boyle, we are also not repackaging anything from Boyle. Rather, we are analyzing the content of the federal common law that the Boyle methodology instructs us to apply. Saleh analyzed the content of this law as well, and the majority simply ignores that there is any such content in its singular focus on the "preemption” label.

. In Al-Quraishi, the district court determined that Iraqi law would apply to the action under Maryland's adherence to the lex loci delicti rule in analyzing choice of law in tort actions. 728 F.Supp.2d at 761-62. In Al Shimari, the district court noted that it would "present the parties with the opportunity to address the choice of law issue at a later date,” and did not determine what law would apply. 657 F.Supp.2d at 725 n. 7. Virginia law, however, also applies the lex loci delicti rule and, thus, Iraqi law would appear to apply in that action as well. See Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir.2007) (per curiam). As Judge Wilkinson notes, however, the plaintiffs in Al Shimari contend that Virginia law should apply-

. Compare this language with the Supreme Court’s more recent characterization that qualified immunity “shields government agents from liability for civil damages,” Behrens, 516 U.S. at 305, 116 S.Ct. 834 (internal quotation marks and alterations omitted) (emphasis added), or that it serves as a "protection to shield [defendants] from undue inter *265 ference with their duties and from potentially disabling threats of liability,” Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (emphasis added), and again that government officials are “shielded from liability for civil damages,” id. at 818, 102 S.Ct. 2727 (emphasis added). See also Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (noting that qualified immunity "shield[sI" government officials "from civil damages liability”).

. Some of these courts have considered jurisdictional questions by exercising pendent appellate jurisdiction over the question, reasoning that determining subject matter jurisdiction is "necessary to ensure meaningful review” of the immunity question. See Kwai *268 Fun Wong, 373 F.3d at 960-61; Timpanogos Tribe, 286 F.3d at 1201. Other courts have considered it because of their inherent power and obligation under Steel Co. to consider jurisdiclion. See Hospitality House, 298 F.3d at 429-30. The result is the same under either approach.